**Affirmed, in part, Reversed and Rendered, in part, and Opinion filed June 30, 2016.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-14-00589-CV

---

## 1717 BISSONNET, LLC, APPELLANT AND CROSS-APPELLEE

## V.

## PENELOPE LOUGHHEAD, LUONG NGUYEN, LAM NGUYEN AND KATHERINE HOANG, JOINTLY, JAMIE FLATT, DONALD VERPLANCKEN, NORMAN AND SUANNAH RUND, JOINTLY, ACHIM AND DIANA BELL, JOINTLY, JEANNE MEIS, MARY VAN DYKE, RALPH AND LESLIE MILLER, JOINTLY, YIN AND SURONG ZHANG, JOINTLY, MARTHA GARIEPY, STEPHEN ROBERTS, SUZANNE POWELL, MICHELLE JENNINGS AND MICHAEL TETZLAFF, JOINTLY, JAMES AND ALLISON CLIFTON, JOINTLY, KIMBERLY BELL, RICHARD AND MARY BARANIUK, JOINTLY, KENNETH REUSSER AND XANTHI COUROUCLI, JOINTLY, AND EARLE MARTIN, APPELLEES AND CROSS-APPELLANTS

---

**On Appeal from the 157th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2013-26155**

---

# O P I N I O N

Appellant/Cross-Appellee, 1717 Bissonnet, LLC (hereinafter "Developer"), plans to build a multi-use high-rise building ("the project") in Houston and has obtained city approval. Appellees/Cross-Appellants (hereinafter "Homeowners") own homes in the neighborhood where the project will be located. Homeowners sued Developer, seeking an injunction precluding construction of the project, or alternatively damages, on the ground that the project will be a permanent nuisance. Pursuant to a jury's finding that the project will be a nuisance, if built, as to Homeowners, the trial court rendered judgment (1) awarding Homeowners one category of damages assessed by the jury—lost market value to their properties, (2) disregarding the jury's finding that Homeowners sustained another category of damages—loss of use and enjoyment, (3) taxing all court costs against Developer except for certain costs taxed against other plaintiffs who did not prevail at trial, and (4) denying Homeowners' application for a permanent injunction.[1]

Developer appeals the award of damages and costs to Homeowners and requests that we tax costs against Homeowners. Homeowners cross-appeal, challenging the denial of their application for an injunction.[2] We reverse the portion of the judgment awarding damages to Homeowners and render judgment that Homeowners take nothing on their claim for damages without prejudice to their right to seek damages once a cause of action for an existing nuisance accrues. We also reverse the portion of the judgment taxing costs against Developer and render judgment taxing all costs against Homeowners except for those costs that the trial court taxed against the non-prevailing plaintiffs. We affirm the remainder of the judgment including the denial of the application for a permanent injunction.

[1] The trial court also rendered judgment that the non-prevailing plaintiffs take nothing. Those plaintiffs do not appeal the judgment, so all references to "Homeowners" in this opinion mean only those plaintiffs who prevailed at trial and are appellees/cross-appellants in our court.

[2] Homeowners do not challenge the portion of the judgment disregarding the jury's finding on loss-of-use-and-enjoyment damages.

## I. BACKGROUND

### A.    Factual History

In 2006, Developer purchased a 1.6 acre lot at the corner of Bissonnet Street and Ashby Street in Houston.[3]  At the time, the property was occupied by a two-story apartment complex with 67 units.  The property is located near Rice University, the Texas Medical Center, and the Museum District.  The surrounding neighborhood consists of numerous homes, but there also are several small businesses, including restaurants, several four-to-six-story apartment buildings, and a six-story medical clinic.

In 2007, Developer devised plans to build a 23-story mixed-use building, which would include 226 apartments, a spa, retail, restaurant and office space, and a multi-level parking garage.  Developer filed its plans with the City.  Knowing the project would be a departure in scale from surrounding properties, Developer anticipated opposition from area residents and advised the neighborhood associations about the plans.

The opposition was vehement, with residents fearing negative effects on their established neighborhoods, including impacts on traffic, aesthetics, privacy, and market values of their homes.  Residents mobilized into a group called "Stop Ashby Highrise," erected signs in the area, sent numerous letters to Developer's principals and city officials, and signed petitions, all imploring Developer not to

---

[3] The property was originally purchased by Buckhead Investment Partners, Inc.  Pursuant to a subsequent transaction, the property became owned by Developer—a limited liability company consisting of a managing-member entity of which Buckhead Investment Partners, Inc. is general partner and another entity which is a 90% limited partner.  Kevin Kirton and Matthew Morgan, principals of Buckhead Investment Partners, Inc., remained as owners of the managing-member entity of Developer and thus managers of the project.  For ease of reference, we will refer to "Developer" throughout the opinion as though it were the owner from inception of the project.

build the project. The two Houston mayors who served consecutively during relevant times also opposed the project. The residents and Developer attempted, unsuccessfully, to negotiate a compromise with respect to the size and nature of the project. Otherwise, the parties have remained entrenched in their positions for years, with Developer determined to build and area residents determined to stop the project.

Meanwhile, Developer applied for city approval. The City initially approved Developer's traffic-impact analysis but withdrew the approval shortly thereafter. Developer revised its application ten times with each one being rejected by the City. Ultimately, the City approved another revised application submitted under protest, which called for a reduction (from the original application) of the trip count—the number of automobile trips from the project during peak traffic hours. But, Developer believed the City wrongfully rejected its original application and unsuccessfully appealed through the City process.

Developer then sued the City in a separate suit. In March 2012, those parties settled that suit. The settlement agreement provided that the City will approve all building permits for the project if it satisfies the following requirements: (1) it will be a 21-story residential or mixed-use structure with 228 residential high-rise units, 10,075 square feet of restaurant space, and four townhomes—subject to modification of the intended uses if the other requirements of the settlement agreement are met and the project satisfies a certain maximum trip count (a figure below that originally proposed by Developer); (2) the project will contain a pedestrian plaza in front; (3) the project will have a limited number of, and uses for, driveways; (4) traffic mitigation measures will be implemented, including providing shuttle service and bicycles; (5) there will be a fence along certain property lines and a "green screen" on certain walls of the parking garage; (6)

4

lighting will be hooded or directed away from adjacent residents; and (7) noise-mitigation measures will be implemented. The then-mayor announced the settlement, reiterating her belief "this [is] the wrong project in the wrong place," but expressing that the City lacked a legal basis to stop the project and that the settlement at least gave the City some control over the scope.

The City's final building permit issued in March 2013. Developer proceeded to advance its plans and razed the existing apartment complex but has not begun construction of the project.

## B.    Procedural History

According to the residents, they were unable to obtain detailed plans for the project during the permit process. One resident's open records request with the City was denied. Developer refused to provide the plans until approval by the City out of concern that the plans might spawn litigation. In January 2013, one resident filed an action to obtain pre-suit discovery about the plans. The trial court ordered Developer to produce certain information regarding construction. In May 2013, that resident plus six additional residents filed the present suit, alleging, inter alia, the project would constitute a nuisance and seeking damages and a permanent injunction precluding construction. That suit was transferred to the present trial court below, which was hearing the pre-suit action. After various amendments, forty-five plaintiffs, as owners of thirty homes, were parties by the time of trial.

At trial, the plaintiffs presented evidence, albeit contested by Developer, regarding various negative effects anticipated because of the project: increased traffic; shadows cast on some homes; increased lighting and noise; the ability of project residents to view into some plaintiffs' yards; and an expert's opinion that the weight of the project will cause foundation and structural damage to some homes. The plaintiffs also presented an expert opinion that their properties already

5

had sustained a loss in market value because of the proposed project; in other words, the market already had responded to the mere fact that Developer plans to build the project.

Only two questions were submitted in the jury charge. In Question No. 1, the jury was asked:

> Is [Developer's] proposed Project abnormal and out of place in its surroundings such that it will constitute a private nuisance if built?
>
> [Developer] creates a "private nuisance" if its Project substantially interferes with Plaintiffs' use and enjoyment of their land.
>
> "Substantial interference" means that the Project must cause unreasonable discomfort or unreasonable annoyance to a person of ordinary sensibilities attempting to use and enjoy the person's land. It is more than a slight inconvenience or petty annoyance.
>
> A nuisance, if it exists, is not excused by the fact that it arises from an operation that is in itself lawful or useful.
>
> Answer "Yes" or "No" for each plaintiff.

The jury answered "yes" for the twenty homes owned by the twenty-nine Homeowners in this appeal and "no" for the other homes.

The jury was asked to answer Question No. 2 relative to Homeowners:

> What sum of money, if paid now in cash, would fairly and reasonably compensate plaintiffs for their damages, if any, proximately caused by the nuisance?
>
> Consider the elements of damages listed below and none other. Consider each element separately. . . .
>
> > 1.  Loss of Market Value. Consider the difference in market value of each plaintiff's property caused by the nuisance. Market value means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.

6

2.  Loss of Use and Enjoyment of the Property.

Answer separately, in dollars and cents for damages, if any.

For each of the twenty homes, the jury assessed various amounts for both loss of market value and loss of use and enjoyment. These damages totaled about $1.6 million, with the lost-market-value portions totaling about $1.2 million.

Developer filed a motion for entry of judgment, for judgment notwithstanding the verdict ("JNOV"), and to disregard the jury findings, requesting the trial court to (1) render judgment in Developer's favor as to the plaintiffs for which the jury did not find a nuisance, and (2) render a JNOV or disregard both of the jury's findings as to Homeowners, on numerous grounds. Homeowners also moved for entry of judgment, requesting the trial court to permanently enjoin the project in light of the jury's nuisance finding instead of awarding damages; but Homeowners reserved the right to recover damages should the injunction be denied. Both parties and amici curiae submitted additional filings relative to the injunction request.

Over two days during March and April 2014, the trial court held a hearing to determine the appropriate judgment to render. The trial court heard additional evidence and considered the evidence admitted at trial. Subsequently, the trial court signed an "Opinion and Order," in which it (1) granted Developer's motion for judgment as to the plaintiffs for which the jury did not find a nuisance, (2) denied Developer's motion for JNOV, (3) denied Developer's motion to disregard the jury's findings on nuisance and lost-market-value damages as to Homeowners, (4) granted that motion as to loss-of-use-and-enjoyment damages on the ground such damages were not ripe until the project is built, and (5) denied Homeowners' application for a permanent injunction. As discussed more below, the trial court set forth a detailed explanation for these rulings.

7

The trial court then signed a final judgment consistent with its previous order. Therefore, the trial court (1) ordered that the plaintiffs who did not prevail at trial take nothing, (2) ordered that Homeowners recover the lost-market-value damages assessed by the jury, plus post-judgment interest, without prejudice to their right to seek and recover loss-of-use-and-enjoyment damages when such damages become ripe for determination, (3) taxed all costs against Developer except for certain costs to be taxed against the non-prevailing plaintiffs, and (4) denied Homeowners' application for permanent injunction. Developer and Homeowners now appeal.

## II. DEVELOPER'S ISSUES

Developer presents nine stated issues challenging the award of damages as to all or some Homeowners for alternative reasons, which may be summarized into several categories. First, Developer contends the trial court erred by refusing to disregard the jury's finding on lost-market-value damages as immaterial because there was no liability theory submitted that would support an award of such damages. Then, Developer argues that, even if such damages were recoverable, Homeowners failed to prove their lost market values were proximately caused by the alleged prospective nuisance rather than some other source. Developer also challenges, for multiple reasons, the finding that the project will be a nuisance as to some or all Homeowners.[4] Finally, Developer argues that several Homeowners lacked standing to bring their claims for damages because there was no evidence they had any justiciable interest in their alleged properties at the time of trial.

---

[4] Relative to the nuisance finding, Developer contends (1) there was no evidence the project will constitute a nuisance as to any Homeowners, (2) a determination that it will constitute a nuisance amounts to imposing an inapplicable strict-liability theory, (3) Homeowners failed to plead two of the factors on which they relied when alleging the project will constitute a nuisance, and (4) there is no evidence to support a nuisance finding as to some Homeowners whose properties do not abut the project site.

Additionally, in a tenth issue, Developer challenges the award of court costs to Homeowners and requests that we award costs to Developer.

We will first address the standing issue because lack of standing would deprive the trial court and our court of subject matter jurisdiction to address the merits of those Homeowners' damages claims. *See Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005). As discussed below, we conclude those Homeowners had standing, so we will include their claims in our discussion of the substantive issues.

As further discussed below, we agree the trial court erred by refusing to disregard the finding on lost-market-value damages because there was no liability theory submitted to the jury that would support an award of such damages. Thus, we need not consider Developer's other issues challenging the damages award. We will assume, solely for purposes of discussion, that Homeowners properly pleaded and proved the project, if built, will constitute a nuisance as to all Homeowners and the proposed project had resulted, at the time of trial, in lost market value to their properties. Even assuming such factors, we conclude Homeowners may not seek damages until a nuisance exists. Because of that determination, we also conclude that the trial court erred by taxing court costs against Developer and it is entitled to recover its costs.

## A. Standing

Standing addresses whether a party has a sufficient relationship with the lawsuit so as to have a "justiciable interest" in its outcome. *Id.* at 848. Developer briefly asserts that Martha Gariepy and James and Allison Clifton lacked standing to bring a claim for damages because they did not testify and there is no other evidence they owned any properties in question at the time of trial. However, Homeowners' expert on lost market values referred to all plaintiffs as the owners

9

of properties affected by the project when explaining the task the expert was assigned. Developer did not object to this testimony, much less on the ground that the expert lacked knowledge regarding such ownership for all plaintiffs. And, Developer does not cite any evidence that Gariepy and the Cliftons did not own any homes in question at the time of trial. Accordingly, assuming without deciding that a person must own a property to recover its lost market value as nuisance damages, we construe the expert's testimony as some evidence Gariepy and the Cliftons owned properties in question at the time of trial. *See La China v. Woodlands Operating Co.*, 417 S.W.3d 516, 520–21 (Tex. App.—Houston [14th Dist.] 2013, no pet.) Therefore, we overrule Developer's ninth issue and turn to the award of damages to all Homeowners.

## B.     No liability theory submitted to support the damages award

As quoted above, the only jury question purporting to establish liability asked whether the project will constitute a nuisance "if built." In its Opinion and Order, the trial court remarked that it awarded the lost-market-value damages because Homeowners presented evidence they had already incurred such damages as a result of the planned project. Developer argues the trial court erred by refusing to disregard the damages finding because a prospective, contingent nuisance is not a tort that can support an award of damages.

A trial court may disregard a jury finding only if there is no evidence to support the finding or if the issue is immaterial. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994). A question is immaterial when it should not have been submitted or was properly submitted but has been rendered immaterial by other findings. *Id.* A jury question is immaterial when its answer can be found elsewhere in the verdict or when its answer cannot alter the effect of the verdict. *See City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex.

10

1995). A question that calls for a finding beyond the province of the jury, such as a question of law, may be deemed immaterial. *See Spencer*, 876 S.W.2d at 157. When a trial court's ruling on a motion to disregard is based on a legal issue, we review the ruling *de novo*. *Hall v. Hubco, Inc.*, 292 S.W.3d 22, 27–28 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

### 1. No cause of action for damages from a prospective nuisance

We agree that the damages question should not have been submitted because there is no cause of action for damages caused by a prospective nuisance, which is a question of law. *See Cook v. Neely*, No. 04-14-00518, 2015 WL 4554286, at *2 (Tex. App.—San Antonio July 29, 2015, pet. denied) (mem. op.).[5]

As the jury was essentially instructed in the present case, a "nuisance" is "a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities." *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 269 (Tex. 2004). If a nuisance is permanent, a landowner may recover the property's lost market value as a result of the nuisance. *Id.* at 276.

A court may exercise its equitable power to **enjoin** a prospective nuisance under certain circumstances. *See Freedman v. Briarcroft Prop. Owners, Inc.*, 776 S.W.2d 212, 216 (Tex. App.—Houston [14th Dist.] 1989, writ denied). However, Homeowners do not cite, and we have not found, any Texas authority permitting

---

[5] In the jury question on damages, the instruction "Consider the difference in market value of each plaintiff's property caused by the nuisance" was worded as though the project already had been built and thus already constituted a nuisance. However, even Developer seems to acknowledge that the "nuisance" referenced in the damages question meant the prospective nuisance referenced in the first jury question because it is undisputed there was no nuisance yet. Accordingly, solely for purposes of addressing whether there was a liability theory supporting submission of the damages question, we will treat the "nuisance" referenced in that question as the prospective nuisance.

11

**recovery of damages** in tort liability for a prospective nuisance. In the absence of any basis in the common law or any statute, as an intermediate court of appeals, we decline to create a new tort cause of action allowing the recovery of damages allegedly caused by a prospective nuisance. *See Envtl. Procedures, Inc. v. Guidry*, 282 S.W.3d 602, 628 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

The Supreme Court of Texas has spoken about tort liability for nuisance in terms of an existing condition that has interfered with a plaintiff's use or enjoyment of his property. For example, many years ago, the court recognized the general principle that "all damages that are the natural and necessary consequence of **a nuisance** may be recovered under a general allegation of damage." *Comminge v. Stevenson*, 13 S.W. 556, 557 (Tex. 1890) (emphasis added). Moreover, the court has stated with respect to the statute of limitations on a claim for nuisance damages, "[a] permanent nuisance claim accrues when the condition **first** 'substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities.'" *Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 153 (Tex. 2012) (emphasis added) (quoting *Bates*, 147 S.W.3d at 269–70).

The trial court relied on the fact that Homeowners presented evidence their homes already had lost market value because of the plan to build the project. But, it is axiomatic there may be various circumstances that cause a home to lose market value that are not necessarily torts, including a nuisance. *See Bates*, 147 S.W.3d at 277 ("Property values are affected by many factors; a decrease in market value does not mean there is a nuisance, any more than an increase means there is not."). The Supreme Court of Texas has rejected the reasoning that loss in market value alone permits recovery of damages when no cause of action authorizing such recovery has been established: "'If there be no nuisance, there can be no recovery

12

of damages for such annoyance as may exist, nor for diminution in the value of the property.'" *Bay Petroleum Corp. v. Crumpler*, 372 S.W.2d 318, 318–20 (Tex. 1963) (quoting *Sherman Gas & Elec. Co. v. Belden*, 123 S.W. 119, 120 (Tex. 1909) and affirming take-nothing judgment where plaintiffs obtained finding that defendant's operation caused dimunition in market value to plaintiff's property but no finding that operation was a nuisance); *Sherman Gas*, 123 S.W. at 119–21 (reversing award of damages to plaintiff for lost market value resulting from defendant's operation where jury charge did not properly inquire whether operation was a nuisance and remanding because trial court should have included such inquiry). We acknowledge there was no finding of a nuisance in any form in those cases whereas the jury in the present case found a prospective nuisance. Nevertheless, those cases stand for the proposition that loss in market value caused by a defendant's actions is not recoverable without a viable cause of action. *See Bay Petroleum*, 372 S.W.2d at 318–20; *Sherman Gas*, 123 S.W. at 119–21. In fact, in those cases, the defendants' offending structures that caused the plaintiffs' properties to lose market value were already in operation; yet, the supreme court held that those damages were not recoverable without a nuisance finding. *See Bay Petroleum*, 372 S.W.2d at 318–20; *Sherman Gas*, 123 S.W. at 119–21.

Developer cites an old case from a court of appeals, which is nonetheless persuasive because the court rejected that lost-market-value damages are recoverable for an anticipated nuisance. In *Sanders v. Miller*, 113 S.W. 996, 996–97 (Tex. Civ. App. 1908, no writ), the plaintiff was awarded lost market value to his property on a permanent-nuisance theory as a result of the defendant having built a swimming pool on his nearby property. The evidence showed that, at the time of trial, the pool was not yet filled with water and was merely "a dry tank." *See id.* at 996. The plaintiff alleged that harmful consequences from the pool

13

(primarily disease from mosquito infestation) were expected once the pool was filled with water although the pool had not yet interfered with the use and enjoyment of the plaintiff's property. *Id.* at 997. Thus, the plaintiff essentially alleged that "the mere presence of the pool, or excavation in the ground," because it would eventually be filled with water, supported an action for damage even "before it attained an offensive condition." *See id.*

The court of appeals stated that the fact the plaintiff suffered a dimunition in market value did not create an action for damages because not every injury to another's property creates actionable liability; rather, for the injury to form the basis for an action, there must be "a substantial invasion of, or interference with, the legal rights of the owner." *Id.* at 998. The court therefore held that the plaintiff did not have a cause of action because there was no such interference and thus no nuisance yet, although such interference was expected in the future: "The entire claim for damage is predicated upon a condition which it is expected will arise sometime in the future." *See id.* at 999.[6] Unlike in the present case, the form of the pool already had been built in *Sanders*; but significantly, the aspect which might constitute a nuisance in *Sanders*—presence of water and its adverse consequences—was merely anticipated and could not support an award of lost-market-value damages. *See id.* Likewise, in the present case, the nuisance is merely anticipated and thus will not support an award of lost-market-value damages even if those damages have already occurred because of the plan to build the project.

---

[6] Alternatively, the court held that the plaintiff could not recover lost market value because any nuisance was abatable. *See Sanders*, 113 S.W. at 999–1000.

## 2.    Homeowners' arguments

Despite the lack of authority supporting recovery of damages for a prospective nuisance, Homeowners proffer several reasons such damages are permitted in the present case, in addition to relying on the trial court's reasoning discussed above.

Homeowners maintain that Developer "led the trial court down the path it took." In particular, Homeowners assert that Developer consistently urged in the trial court, when opposing Homeowners' application for permanent injunction, that Homeowners have an adequate remedy at law through recovery of damages. We disagree that Developer's position in the trial court was consistently contradictory to its appellate challenge to the damages award: on appeal, Developer argues there is no cause of action for damages **before** the project is built; in its post-trial filings, Developer argued injunctive relief is improper because Homeowners will have an adequate legal remedy via a claim for damages **after** the project is built. Since the verdict, Developer has consistently urged the trial court to disregard the finding on lost-market-value damages. Thus, Developer did not lead the trial court to award those damages.

Similarly, Homeowners argue that Developer's appellate argument that damages are not yet recoverable is contradictory to its position in the trial court that Homeowners unduly delayed in bringing suit. However, in the instance cited by Homeowners, Developer opposed Homeowners's request for a permanent injunction on, among other grounds, the fact that Homeowners waited years since the project was announced to file suit and until after Developer had begun razing the previous apartment complex. That argument is not contradictory to the position that there is no action for damages before the project is built.

15

Homeowners also emphasize that Developer unquestionably intends to build the project. Regardless of how absolute Developer's plan may be, again, there is no cause of action for planning to construct a project that will be a nuisance. And, no matter how absolute the plan may be, clearly the project is not a reality until built and the scope of the project could change after trial. Accordingly, any lost market value resulting merely from the plan to build the project still retains a speculative aspect because the market value could rebound if the plan were abandoned, for whatever reason. That fact demonstrates the untenability of awarding damages resulting solely from one's plan to take some action in the future that may be wrongful under tort law or otherwise compensable. *See City of Houston v. Biggers*, 380 S.W.2d 700, 704 (Tex. Civ. App.—Houston 1964, writ ref'd n.r.e.) (holding that passage of city ordinance including owner's land in what was contemplated as a civic center did not constitute a taking authorizing compensable damages, even if ordinance interfered with marketability of property, because ordinance was purely legislative and could be changed at any time).

Finally, Homeowners contend that if damages are not recoverable before building commences and yet Homeowners wish to enjoin construction, they are placed in a difficult position: they must file suit pre-construction to request injunctive relief but risk that damages are unavailable at that point; or they must wait until the project is built to seek damages when it is too late to seek an injunction. However, we disagree that any practical consideration authorizes a cause of action when none exists. Moreover, Homeowners present no reason why they are precluded from seeking to enjoin the project before it is built and if unsuccessful, seeking damages once a nuisance exists.

In summary, because Texas law does not recognize a cause of action for damages resulting from a prospective nuisance and that was the only liability

16

theory submitted to the jury, the trial court erred by denying Developer's motion to disregard the damages finding. We sustain Developer's first and second issues.

## C.    Award of costs

In its post-trial motion, Developer asked the trial court to award Developer its court costs against all plaintiffs. The trial court awarded Developer certain costs against the non-prevailing plaintiffs. But, the trial court awarded court costs to Homeowners as the prevailing plaintiffs. In its tenth and final issue, Developer challenges that order and requests that we render judgment awarding Developer all of its costs against Homeowners. Homeowners urge that we uphold the award of costs because they were prevailing parties as to the nuisance issue and on their request for lost-market-value damages. Developer is now the prevailing party on all of Homeowners' claims in light of our conclusion that the trial court erred by awarding any damages to Homeowners and, as set forth below, our upholding the trial court's denial of a permanent injunction. Homeowners do not assert that there is good cause to adjudge costs against Developer if Developer is the prevailing party. *See* Tex. R. Civ. P. 141. Therefore, Developer is entitled to recover its costs as the only "successful party" to the suit. *See* Tex. R. Civ. P. 131 ("The successful party to a suit shall recover of his adversary all costs incurred therein, except where otherwise provided."). Accordingly, we sustain Developer's tenth issue.

### III.  HOMEOWNERS' CROSS-APPEAL

In their cross-appeal, Homeowners present a single issue challenging the trial court's denial of Homeowners' request for a permanent injunction.

To obtain a permanent injunction, a party must ordinarily show (1) a wrongful act, (2) imminent harm, (3) an irreparable injury, and (4) the absence of an adequate remedy at law. *Triantaphyllis v. Gamble*, 93 S.W.3d 398, 401 (Tex.

17

App.—Houston [14th Dist.] 2002, pet. denied).  When a jury has found a nuisance, the trial court should balance the equities in deciding whether to issue a permanent injunction, including considering the injury an injunction may cause the defendant or the public and injury that may be suffered by the plaintiffs if the injunction is denied.  *See Storey v. Cent. Hide & Rendering Co.*, 226 S.W.2d 615, 618–19 (Tex. 1950); *see also Triantaphyllis*, 93 S.W.3d at 401–02.  We review the denial of a request for a permanent injunction for abuse of discretion.  *See Triantaphyllis*, 93 S.W.3d at 402.  A trial court abuses its discretion if its acts arbitrarily and unreasonably, without reference to guiding rules or principles, or misapplies the law to the established facts of the case.  *Id.*  The trial court does not abuse its discretion when its decision is based on conflicting evidence and some evidence in the record reasonably supports the trial court's decision.  *Id.*

In its Opinion and Order, the trial court detailed numerous factors that it considered when balancing the equities and denying the injunction.  Homeowners assert that some of the factors are unsupported by any evidence or the trial court misapplied the law to the evidence, and Homeowners proffer reasons that equity required the injunction.  We note the trial court did not file separate findings of fact and conclusions of law.  However, some of the remarks in the opinion sound as findings of fact although the opinion is in discussion format.  Thus, when applicable, we will treat remarks as findings of fact and apply the above-cited standard of review.  *See In re C.A.B.*, 289 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (recognizing appellate court may consider recitations in judgment as findings of fact when not supplanted by separately filed findings).

18

After evaluating the following factors outlined by the trial court, we conclude it did not abuse its discretion by refusing to enjoin the project.[7]

## A. Finding of nuisance was localized

The trial court stated that generally only those plaintiffs immediately adjacent to the project prevailed at trial—those with homes within about 200 feet of the project. According to the trial court, although the exact reasoning of the jury cannot be known, the finding suggested the jury rejected the traffic and shadow concerns raised by the plaintiffs. On appeal, Homeowners do not challenge the trial court's assessment that the nuisance is localized or its reliance on that fact. Consequently, we defer to the trial court's decision that the limited impact of the project weighed against an injunction.

## B. Difficulties in enforcing an injunction

The trial court cited the difficulties inherent in enforcing an injunction, including that such relief would lead to an endless series of lawsuits and contempt motions, reasoning as follows: (1) the nuisance finding applied only to the project as proposed at the time of trial and permitted by the City; (2) the trial court was not asked to enjoin a particular type of business (such as a racetrack or hide tanning facility) because Homeowners' primary opposition to the mostly residential building is based on its size; (3) Homeowners did not obtain a finding on what scale of project would be permissible and thus the trial court had no finding on which to base an injunction restricting the building to any certain size—it had an

---

[7] Developer presents cross-points for affirming the ruling for reasons other than those stated in the opinion: (1) the project will not constitute a nuisance; (2) the injunction application is moot because Developer made design changes to the project after the jury's verdict; and (3) the proposed injunction is overbroad. We need not consider those contentions because the trial court did not abuse its discretion even if the project as planned at the time of the jury finding will constitute a nuisance.

"all or nothing" proposition of enjoining the project as permitted or not; (4) therefore, if the project were enjoined, a new trial on the nuisance issue would be required if, and each time, the Developer modifies its plan—for example, by planning a 20-story building rather than the 21-story building or a 6-story building but one that occupies more space horizontally and has more units; and (5) alternatively, if the trial court were to enjoin the project, the Developer's building of projects other than the one enjoined would not constitute contempt, but that alternative might nonetheless result in numerous contempt motions.

Homeowners contend the trial court, in effect, unfairly penalized Homeowners for failing to prove what alternative project would be acceptable (a burden they assign to Developer) and that Homeowners were entitled to an injunction by proving **this** project will be a nuisance. However, as set forth above, proving the project will be a nuisance did not entitle Homeowners to an injunction "as a matter of right." *See Storey*, 226 S.W.2d at 618–19; *see also Bates*, 147 S.W.3d at 286–87 (stating trial court may choose not to abate a permanent nuisance even if that is the only remedy requested); *Triantaphyllis*, 93 S.W.3d at 401–02. Further, we disagree that the trial court necessarily required Homeowners to prove what alternative project would not be a nuisance in order to obtain an injunction; the trial court did not deny the application solely because Homeowners failed to prove what project would be acceptable. Instead, the trial court merely cited the difficulties inherent in issuing an injunction under the circumstances of the present case—where Homeowners' primary opposition to the project is size and Developer could modify to address that concern—as one of many equitable reasons that weighed against the relief.

We agree with the trial court that, if it enjoined the project, Homeowners would not be entitled to a contempt finding if Developer modified the project

20

because such modified project will not have been enjoined. And, Homeowners would not automatically be entitled to further injunctive relief because there would be no finding that such project will be a nuisance. Accordingly, the record supports the trial court's reasoning that an injunction would potentially cause endless litigation. *See Bates*, 147 S.W.3d at 287 (recognizing, "Judges may hesitate to issue discretionary orders that require extensive oversight . . . .").

Homeowners rely on *Pool v. River Bend Ranch. LLC*, 346 S.W.3d 853, 859–61 (Tex. App.—Tyler 2001, pet. denied), in which the court upheld an injunction precluding the defendants from operating a commercial all-terrain vehicle park that was a nuisance to a neighbor. The court rejected the defendant's suggestion that the injunction was overly broad by precluding all such commercial activity, rather than reducing the operation to certain levels, because there was no evidence regarding the number of vehicles that would make the operation permissible. *See id.* at 860. *Pool* is distinguishable from the present case because it involved the breadth of an injunction that was granted instead of the denial of an injunction. *See id.* at 859–61. *Pool* does not stand for the proposition that an injunction must be granted when a defendant fails to prove alternatives that would not be a nuisance.

Homeowners also cite *Freedman*, 776 S.W.2d at 217, in which the court upheld the jury's finding that a proposed parking lot would constitute a nuisance although the defendant proffered modifications to its proposal. *Freedman* is inapplicable to the present case because the proposed modifications were considered relative to the fact finder's initial nuisance determination and not with respect to the trial court's decision on whether to enjoin the project. *See id.* The *Freedman* court did not address a trial court's concerns that if an injunction were issued, the defendant might modify its plans, resulting in more litigation. *See id.*

21

Finally, Homeowners cite another case as an alleged model of appropriate relief and assert the trial court erroneously rejected such model. In *Rowe v. Moore*, 756 S.W.2d 117, 118 (Tex. App.—Houston [1st Dist.] 1988, orig. proceeding [leave denied]), the trial court permanently enjoined a church from constructing a parking garage that a jury found would be a nuisance to adjacent residents. Subsequently, the church modified the design of the garage and its location within the church property. *See id.* In denying the residents' motion for contempt, the trial court ruled that the church would not be in contempt if it built a garage that met certain criteria consistent with the revised plan. *See id.* The court of appeals denied one resident's request for mandamus relief, holding the church was not in contempt because the injunction precluded only the previously-planned project, which was the subject of the nuisance litigation. *See id.* at 119–20. In addition to citing *Rowe*, Homeowners presented as evidence in the present case the trial court's orders in *Rowe*, which showed the substance of the injunction and the revised criteria.

However, the fact that one trial court chose to issue an injunction even if it entailed later refining the relief and permitting the project under certain criteria does not mean the trial court was required to do so in the present case— particularly in light of other factors relied on by the trial court, such as the lengthy period that has already passed since inception of the project. Additionally, *Rowe* actually supports the trial court's concerns about future contempt motions and litigation because *Rowe* involved (1) an injunction followed by a motion for contempt when the defendant modified its project, and (2) a ruling that the modification was not in contempt of the injunction, thus raising the possibility of future litigation over whether the revised project will be a nuisance. *See id.* at 118–20. Accordingly, the cases cited by Homeowners do not negate the trial

court's discretion to decide that an injunction will be difficult to enforce in light of the potential for protracted judicial involvement.

## C.    Harm to Developer

Next, the trial court found that an injunction would cause "considerable" hardship to Developer, which would outweigh the "some hardship and disruption" to Homeowners. Specifically, the trial court commented that (1) the Developer had expended money and energy in planning the project over a seven-year period and forfeited rental income by razing the previous complex once the City approved the project, (2) Homeowners delayed filing suit until six of those years had expired and until a year after the Developer's settlement agreement with the City approving the project, and (3) Developer could not recoup its losses even if it sold the property and its efforts "cannot simply be picked up and moved to a new location."

On appeal, Homeowners do not challenge that before they filed suit, Developer invested millions toward the project and forfeited a rental-income stream to prepare for construction. But, Homeowners argue there is no evidence that Developer's efforts cannot be moved to another location and its losses thereby recouped. However, Developer proffered testimony that (1) it cannot move the plans and specs to another site, (2) at the present site, Developer expects to obtain the highest rent in the market (which translates to a higher property value), based on the average incomes of area residents and proximity to the Texas Medical Center, the Museum District, the Central Business District, the Galleria, Greenway Plaza, Rice University, Hermann Park, and the Houston Zoo, (3) Developer anticipates that because of this rental-income potential, effecting a sale two years after the project begins operating will yield Developer $72 million, and (4)

23

Developer believes it could not achieve that rental income elsewhere in the City because of the site's unique proximity to so many amenities.

Moreover, we conclude the trial court reasonably could have inferred that (1) a developer does not simply move plans for a 21-story multi-use building from one site to another, and Developer would expend considerable funds to study and effect a site change, (2) moving to another site would not recoup the rental income forfeited at the present site upon razing the previous complex, and (3) there is no guarantee of a site where the project would be appropriate or permitted. Thus, some evidence supports the trial court's findings with respect to this factor. *See Garland Grain Co. v. D-C Home Owners Improvement Ass'n.*, 393 S.W.2d 635, 641–43 (Tex. App.—Tyler 1965, writ ref'd n.r.e.) (reversing injunction precluding operation of cattle feed lots found to be a nuisance because of odors and citing as a factor significant amounts defendant had spent on the operation).

Homeowners also argue that Developer had opportunities to exit without incurring losses. Homeowners cite a letter from Stop Ashby Highrise to Developer in February 2008, outlining two alternatives to the project. According to Homeowners, these options would have made Developer whole but it rejected them and "doubled-down" on the high rise concept, thereby making all subsequent investment at its own risk. However, one proposal was a general suggestion that the site be redeveloped as a townhome project, that if Developer were uninterested, it sell to an interested developer, and Stop Ashby Highrise would assist in identifying potential developers and financers who could make Developer whole. The other was a general proposal to redevelop the property with fewer but larger units. These proposals were not definite offers to buy the property from Developer for at least the amount of its investments already incurred, much less offers that would give Developer the profits it anticipates after the project is built. Further,

24

another five years expired after these proposals without Homeowners filing suit despite knowing Developer intended to proceed.[8]

In this regard, Homeowners contend the finding that they unnecessarily delayed filing suit was unsupported by the record. Homeowners emphasize they filed suit shortly after Developer received its city permit and Developer had previously withheld the construction plans, so Homeowners were unable to investigate potential impacts. But, Homeowners have been vehemently opposed to the project from the outset based on its size. Additionally, Homeowners waited to file suit until a year after Developer's settlement agreement with the City approving the project ultimately permitted while Developer proceeded to implement its plans. Homeowners stress that Developer took the risk of incurring financial losses because it continued advancing its plans while knowing area residents were opposed. But, we will defer to the trial court's characterizing the scenario as Homeowners opposing the project from the outset but not filing suit while Developer advanced its plans and expended considerable funds.

## D.    City approval of project and harm to community from an injunction

We will consider together the trial court's next two grounds because they are

---

[8] In the factual-background section of their appellate brief, Homeowners reference a third-party's August 2013 written offer to purchase the property. Homeowners do not cite the letter in the argument portion of their brief relative to the trial court's finding that Developer would lose money if the project were enjoined. Instead, Homeowners reference the letter as an alleged example of Developer's deceptive conduct. Homeowners assert Developer denied at trial that it had received a purchase offer from anyone in the neighborhood that it recognized or believed was "real," but disclosed in post-verdict discovery the letter signed by someone in the neighborhood. Nonetheless, the offer was made years after inception of the project and only a few months before trial. Developer's representative testified the offer would not have made Developer whole on the money already invested and Developer was uninterested in selling the property because development would provide the maximum return. Accordingly, the trial court was free to find that the offer did not negate the trial court's consideration of the money Developer had already invested as relevant to the injunction issue.

25

overlapping and Homeowners present a similar challenge to both. The trial court focused on the fact that the City approved the project and, in doing so, extracted concessions from Developer to help ameliorate many neighborhood concerns. The trial court also considered potential harm to the community from an injunction in essentially two manners. *See Bates*, 147 S.W.3d at 287 (stating that in modern society, nuisances may have effects on the public, the economy, and the environment far beyond the neighborhood and a court balancing the equities must consider those effects before issuing an injunction); *Garland Grain Co.*, 393 S.W.2d at 641–43 (citing as another factor when reversing injunction precluding operation of cattle feed lot that operation served welfare of general public and was the only operation of its sort in particular area of the state).

First, the trial court reasoned that an injunction would have a "chilling" effect on other development in Houston because (1) considering the project was approved by the City, the trial court would become a "one man zoning board" in a city with no zoning, and (2) developers might "think twice" about proceeding with projects if after a lengthy permitting process, they also faced the possibility of an injunction and protracted litigation on that issue. The trial court's concerns were supported by the testimony of a representative of Developer's limited partner, who has years in the real-estate-development business; he opined an injunction would create de facto zoning and highly increase the risk associated with development because principals and investors make decisions based on the established regulatory framework of the locale including, in Houston, the lack of zoning.

Homeowners argue heavily that the trial court improperly relied on these factors because Developer misled the City and misrepresented facts at trial. Homeowners contend the trial evidence indicated Developer did not intend to comply with the settlement agreement in certain aspects or generally intended to

26

deceive the City as follows: (1) Developer was considering including more than one restaurant, while making the City believe there would be only one and thus the trip count would be under a certain limit; (2) Developer was contemplating no green screen or one that technically complied with the settlement agreement by covering walls but would not block light from the parking garage—the primary purpose of the screen; and (3) Developer intended for its foundation design submitted to the City to appear credible and falsely lead the City to believe that design would be implemented. Thus, Homeowners suggest city approval of the project was immaterial and the only "chilling" effect of an injunction would be to deter developers from misleading the City.

The trial court did not specifically discuss the evidence cited by Homeowners. But after reciting that the settlement agreement called for certain design changes, the trial court remarked, "Defendant followed all of the rules required of the City." This remark is somewhat general but indicated the trial court found that Developer's plans comply with the agreed criteria. Regardless of how the trial evidence is characterized, a principal of Developer testified at the post-trial hearing that it has no intent to violate the settlement agreement "in any way." We will defer to the trial court's discretion to take Developer at its word. Alternatively, the trial court was free to decide that (1) complaints about violations of the settlement agreement are not ripe until they occur, and (2) the City can take enforcement action in the future if Developer commits a violation, rather than the trial court enjoining the project as presently permitted.

Additionally, Homeowners assert the record shows Developer attempted to conceal evidence in the following manner: (1) Developer did not initially conduct tests to determine whether the project will physically damage adjacent homes; (2) when Developer finally performed the tests only days before trial, it

27

misrepresented or concealed the results, causing further discovery during trial; and (3) the results comported with those obtained by Homeowners' expert showing construction may physically damage some homes. However, the trial court could have concluded that any attempts to conceal evidence regarding potential damage were more relevant to the determination of whether the project will be a nuisance than to the injunction issue. When denying the injunction, the trial court presupposed the project might cause physical damage but decided, as discussed below, a future claim for such damages would be the appropriate remedy.

Finally, the trial court heard all of the evidence allegedly showing deception and that issue was fully vetted. The trial court was in the best position to evaluate the credibility of Developer's representatives, including Developer's assurance about compliance with the City criteria, and decide what weight to assign any evidence of deception. Thus, assuming without deciding that Developer was deceptive in certain areas, we must defer to the trial court's decision that the reasons for denying injunctive relief outweighed such misconduct.[9]

As its second consideration under these factors, the trial court mentioned that the project will generate millions in tax revenues and provide housing for the Houston Medical Center, Rice University, and other urban destinations. That assertion is supported by evidence reflecting the project will provide 232 residential units, generate property taxes of at least $1.7 million, and, although not

---

[9] Homeowners also assert that there will be no chilling effect on development because evidence proffered by Homeowners during the jury trial and excluded by the trial court demonstrated the project would not be permitted today—evidence that there is now a City buffering ordinance that requires a certain setback between a high-rise and neighboring residences. Homeowners assert this evidence, although excluded during the jury trial, was before the trial court relative to the injunction issue. Even if the trial court considered that evidence, it could have decided the evidence failed to negate that an injunction would have a chilling effect on development; specifically, the trial court could have concluded that an injunction still would set a precedent of uncertainty because area residents might seek to enjoin a permitted project for reasons unrelated to a setback.

specifically cited by the trial court, create 2,000 to 2,800 jobs. Homeowners contend there was no evidence that the project will benefit the City at its present site more than it would at another site or that the currently planned size will provide more benefits than a smaller building. However, the trial court was free to rely on the evidence regarding the unique benefits at the present site and conclude those benefits would derive, in part, from the currently planned size, in terms of the amounts of jobs and residences created and taxes generated. The trial court had discretion to decide that those benefits outweigh the harm to Homeowners. *See Lee v. Bowles*, 397 S.W.2d 923, 927 (Tex. Civ. App.—San Antonio 1965, no writ) (upholding denial of application to permanently enjoin race track and citing, inter alia, trial court's finding that track would provide economic and recreational benefits to the public).

## E.    Other projects nearby

The trial court asserted that "[m]id-rise buildings are sprouting up throughout the inner city," and within two to three blocks of the project are several four-to-six-story residential buildings and a six-story medical office, thereby making the neighborhood dense without the project. On appeal, Homeowners do not challenge the trial court's reasoning, so we will defer to its reliance on this factor.

## F.    Privacy Concerns pre-dated the project

The trial court commented that Homeowners' privacy concerns did not justify an injunction because (1) any person who lives next to a two-story home bears the likelihood a neighbor could peer into the person's backyard, (2) residents of the previous complex could look into some Homeowners' properties, and (3) the project raises fewer privacy concerns because it will be set back further from the property line than the previous complex and the apartments will not start until the

fifth floor (above the parking garage) whereas the previous complex had second-story apartments. In fact, the trial court attached to its opinion photographs showing views from the former complex into some yards. Homeowners also do not challenge the trial court's reliance on this factor, so again we defer to the trial court's finding.

## G. Adequate remedy at law

The trial court opined that Homeowners have an adequate remedy at law through a claim for monetary damages. We note that the trial court referenced both the lost-market-value damages it intended to award and a claim for any damages that might later become ripe. As discussed above, we reverse the award of lost-market-value damages incurred before a nuisance exists. However, the trial court's reasoning on this factor remains because Homeowners may seek damages once a nuisance exists.

Homeowners do not dispute that they may assert such a future claim for damages. Rather, Homeowners argue that the trial court ignored authority indicating that a threatened harm to real property is irreparable as a matter of law and damages are not an adequate remedy. Homeowners cite Texas Civil Practice and Remedies Code section 65.011, which sets forth the various grounds for an injunction and provides in pertinent part: "A writ of injunction may be granted if . . . irreparable injury to real or personal property is threatened, irrespective of any remedy at law." Tex. Civ. Prac. & Rem. Code Ann. § 65.011(5) (West 2008). Contrary to Homeowners' suggestion, the statute does not provide that a threatened injury to real property is always irreparable or that there is never an adequate remedy at law for an irreparable injury to real property. *See id.* Further, the statute uses the word "may" and does not require injunctive relief if there is a threatened

irreparable injury to real property. *See id.* The statute merely permits an injunction in that situation even if there is an adequate remedy at law. *See id.*[10]

Homeowners also cite *Stein v. Killough*, 53 S.W.3d 36, 43–44 (Tex. App.—San Antonio 2001, no pet.), in which the court affirmed a permanent injunction where the plaintiffs demonstrated the defendant's plans would cause an irreparable injury in terms of a loss in market value to the plaintiffs' property. However, that court did not state that a trial court *must* grant a permanent injunction in such a situation. *See id.* And, Homeowners' theory is contrary to authority requiring the trial court to balance the equities before enjoining a nuisance that causes harm to real property. *See Storey*, 226 S.W.2d at 618–19; *see also Bates*, 147 S.W.3d at 286–87. Consequently, the trial court retained discretion to deny an injunction even in the face of a threatened injury to real property because, among other considerations, Homeowners have an adequate remedy at law through a future claim for damages.

## H. Other factors

The trial court also identified two other factors "of lesser importance" but worthy of consideration.

### 1. Choice of some plaintiffs to buy homes in the neighborhood

The trial court stated that several Homeowners bought their homes during the controversy, which did not disqualify them from obtaining damages for a prospective nuisance but should be considered as to the injunction issue. Homeowners do not challenge the trial court's consideration of this factor. We see

---

[10] The trial court acknowledged section 65.011(5) but also remarked that subsequent case law still requires that there be no adequate remedy at law in order to obtain an injunction. We need not decide whether a court may enjoin a prospective nuisance that will cause an irreparable injury to real property even if there is an adequate remedy at law because the statute does not require such relief.

31

no reason it was precluded from considering that potential harm from the project has not deterred some persons from wanting to buy homes in the area.

### 2. "He who seeks equity must do equity."

Finally, the trial court included the above-quoted language, referencing the principle that a party seeking an equitable remedy must do equity and come to court with clean hands. *See Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988). The trial court acknowledged that although most of the Homeowners' conduct has been perfectly proper, many residents, including some Homeowners, aggressively fought the project. The trial court recited that some area residents made threats against Developer's principals and threatened to picket homes of investors, appear at businesses and homes of contractors and service providers who work on the project, confront tenants, and boycott and demonstrate against any restaurant that occupies the project.

We agree with Homeowners that vehemently opposing the project alone would not necessarily be improper. But, the trial court was free to properly characterize threats as beyond appropriate opposition efforts. Homeowners also assert the trial court erroneously penalized Homeowners for the behavior of anonymous protestors. However, the record demonstrates some Homeowners did sign a letter making some of the threats,[11] an injunction would benefit those Homeowners and non-party residents who made threats, and it is undisputed the efforts to stop the project were collective among area residents. Consequently, the

---

[11] For instance, participants to the letter threatened, "We will appear at your tenant's restaurant and demonstrate our opposition to their presence in our neighborhood. If your restaurant tenant has other locations, we will boycott and appear at those locations as well. We will appear at the locations of the owners, investors, and chef of your restaurant tenant and demonstrate our opposition to their presence in our neighborhood."

trial court could consider the behavior of a few Homeowners as a minor ground, among the other grounds, for denying injunctive relief.

In summary, the trial court's denial of the application for injunction was not arbitrary or unreasonable, without reference to guiding rules or principles; instead, the trial court considered extensive evidence and briefing and detailed numerous reasons, supported by the evidence, for its ruling and did not misapply the law to the evidence. Thus, under our standard of review, we must defer to the trial court's balancing of the equities and its conclusion that the factors outlined above outweighed Homeowners' arguments in favor of the relief. Accordingly, we overrule Homeowners' sole cross-issue.

## IV. CONCLUSION

We reverse the portion of the judgment awarding damages to Homeowners and render judgment that Homeowners take nothing on their claim for damages without prejudice to their right to seek damages once a claim for an existing nuisance accrues. We also reverse the portion of the judgment taxing costs against Developer and render judgment taxing all costs against Homeowners except for those that the trial court taxed against the non-prevailing plaintiffs. We affirm the remainder of the judgment.


/s/   John Donovan
     Justice


Panel consists of Chief Justice Frost and Justices Boyce and Donovan.