

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00011-CV

_____

In re D.L., Relator

Original Proceeding
367th District Court of Denton County, Texas
Trial Court No. 16-08532-431

Before Kerr, Birdwell, and Walker, JJ.
Opinion by Justice Walker

## OPINION

The trial court found Mother[1] in contempt for violating its possession-and-access order and assessed her punishment at commitment to jail for sixty days for each of six violations, probated the first twenty days of each punishment, and then ordered her to report to the sheriff to serve the remaining forty days in jail with each punishment to run concurrently. Before reporting to the sheriff, Mother filed this petition for writ of mandamus and a motion to stay the trial court's contempt-and-commitment order. We granted the stay pending review of Mother's petition.

In Mother's first issue, regarding the first five violations, Mother contends that she complied with the possession-and-access order when she surrendered the children to Father. In her second issue, she argues that to the extent that she did not comply, her noncompliance was involuntary because the children refused to go with Father.

In her third issue, regarding the sixth violation—Mother's failure to comply with the possession-and-access order's right of first refusal—Mother contends that this provision is too vague to enforce by contempt.

In issue four, Mother argues that to the extent any contempt finding is void, the punishments for all the contempt findings are void because the trial court assessed but one punishment for all six violations.

---

[1]We use aliases to identify the children, and we identify family members by their relation to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

2

Finally, in issue five, Mother maintains that because the contempt order is void, the award of attorney's fees in Father's favor is also void.

We hold that the trial court assessed separate punishments for each violation, so each contempt finding and punishment stands or falls independently of the others. We hold that the record supports the trial court's contempt finding on the first violation, so we need not address the remaining violations, all of which carry the same punishment as the first violation and run concurrently with it. Because the contempt order is not void, Mother's attack on the award of attorney's fees fails.

We overrule Mother's issues and deny her petition for writ of mandamus.

## I. MANDAMUS AS A REMEDY

Where a relator is not currently restrained of her liberty, a contempt order may be challenged in the context of a mandamus proceeding. *See In re Long*, 984 S.W.2d 623, 625 (Tex. 1999) (orig. proceeding); *Rosser v. Squier*, 902 S.W.2d 962, 962 (Tex. 1995) (orig. proceeding); *In re Spates*, No. 14-14-00603-CV, 2014 WL 4262197, at *2–3 (Tex. App.—Houston [14th Dist.] Aug. 28, 2014, orig, proceeding) (per curiam) (citing *Snodgrass v. Snodgrass*, 332 S.W.3d 653, 660, 663 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding)[2]).

We grant the extraordinary relief of mandamus only when the trial court has clearly abused its discretion and the relator lacks an adequate remedy at law, such as

---

[2]*Snodgrass* was a consolidated appeal and mandamus proceeding. 332 S.W.3d at 655. On the appeal portion, neither party filed a petition for review.

an appeal. *See In re State*, 355 S.W.3d 611, 613 (Tex. 2011) (orig. proceeding); *In re Team Rocket, L.P.*, 256 S.W.3d 257, 259 (Tex. 2008) (orig. proceeding); *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding).

A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable that it is a clear and prejudicial error of law or if it fails to correctly analyze or apply the law to the facts. *In re H.E.B. Grocery Co.*, 492 S.W.3d 300, 302–03 (Tex. 2016) (orig. proceeding); *Walker*, 827 S.W.2d at 839–40; *see also State v. Naylor*, 466 S.W.3d 783, 793 (Tex. 2015) (orig. proceeding)[3] ("A writ of mandamus is an extraordinary remedy available 'to correct an action of a trial judge who commits an abuse of discretion or a violation of a clear duty under the law.'" (quoting *State v. Walker*, 679 S.W.2d 484, 485 (Tex. 1984) (orig. proceeding))). We defer to a trial court's factual determinations that have evidentiary support, but we review the trial court's legal determinations de novo. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding).

## II. PRELIMINARY MATTER

We address Mother's fourth issue first. She contends that the trial court assessed one punishment for all six violations.

If the trial court finds more than one act of contempt but assesses only one punishment, and if one act is not punishable by contempt, then the entire judgment is

---

[3]In *Naylor*, the supreme court decided both an appeal and a petition for writ of mandamus. 466 S.W.3d at 786.

void.  *In re Hall*, 433 S.W.3d 203, 207 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding) (citing *In re Henry*, 154 S.W.3d 594, 598 (Tex. 2005) (orig. proceeding), and *In re Gabbai*, 968 S.W.2d 929, 931 (Tex. 1998) (orig. proceeding)).  In contrast, if the trial court assesses a separate punishment for each act of contempt, only the invalid portions are void.  *Id.* (citing *Ex parte Russell*, 875 S.W.2d 467, 470 n.7 (Tex. App.—Austin 1994, orig. proceeding), and *Ex parte Linder*, 783 S.W.2d 754, 758 (Tex. App.—Dallas 1990, orig. proceeding)).  Void portions are severable: "It is possible to sever the invalid portion of a contempt judgment, leaving the remainder intact, if the trial court assesses a separate punishment for each instance of non-compliance with the underlying order."  *Russell*, 875 S.W.2d at 470 n.7.

Thus, if Mother is correct and the trial court assessed only one punishment for all six violations, and if she can show that any one violation is void, then the entire order is void.  *See Hall*, 433 S.W.3d at 207.  The contempt order provides,

> The Court further finds that on the day of this hearing [Mother] had the ability to comply with the prior order of the Court.

**Relief Granted**

> IT IS ADJUDGED that [Mother] is in contempt for each separate violation enumerated above[, that is, allegations one, two, three, four, six, and seven].  The Court DENIES the request of contempt for alleged violation 5.

**Criminal Contempt**

> IT IS ORDERED that [Mother] shall be confined in the county jail of Denton County, Texas, for a period of 60 days as punishment for violations 1, 2, 3, 4, 6, and 7.

5

> IT IS ORDERED that the first twenty (20) days from the date [of] this order is signed are probated. After twenty (20) days following entry of this order, IT IS ORDERED that [Mother] shall turn herself over to the Denton County Sheriff and [Mother] is ORD[E]RED to serve forty (40) days on each count. The jail time for each violation shall run concurrently.

We construe the order in its entirety. *See Coleman v. Hallum*, 232 S.W. 296, 297 (Tex. Comm'n App. 1921, judgm't adopted); *Palomin v. Zarsky Lumber Co.*, 26 S.W.3d 690, 695 (Tex. App.—Corpus Christi–Edinburg 2000, pet. denied). The first paragraph under "Criminal Contempt" is admittedly ambiguous, but the second paragraph removes all ambiguity by stating that the punishment is "on each count" and that "jail time for each violation shall run concurrently." If the trial court assessed only one global punishment, the need to specify that the punishment is "on each count" and that the punishments are running concurrently would be unnecessary.

This construction is consistent with the trial court's email ruling. After the hearing on Father's motion for enforcement, the trial court sent to the parties an email memorandum finding Mother in contempt for allegations one, two, three, four, six, and seven, and "for each violation," it assessed Mother's punishment at sixty days in the county jail, with all six punishments to run concurrently. The trial court suspended the first twenty days subject to Mother's compliance with all existing orders.

We overrule Mother's fourth issue.

Having rejected Mother's argument, if any one violation is valid, we need not address the remaining five because even if they are void, Mother would still have to serve jail time for the one valid violation. *Cf. 1717 Bissonnet, LLC v. Loughhead*, 500 S.W.3d 488, 496 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("A question is immaterial when it should not have been submitted or was properly submitted but has been rendered immaterial by other findings."); *McDaniel v. Cont'l Apartments Joint Venture*, 887 S.W.2d 167, 170–71 (Tex. App.—Dallas 1994, writ denied) (op. on reh'g) ("A trial court may . . . disregard a jury finding when other jury findings render it immaterial.").

Because we hold that the first violation is valid, we focus our discussion largely there. In the first alleged violation, Father asserted that on July 30, 2021, Mother failed and refused to surrender the children to him at 6:00 p.m. at her residence, as required by the possession-and-access order.

## III. BACKGROUND

### A. THE POSSESSION ORDER

On December 7, 2018, Mother and Father entered into an agreed order regarding possession and access to their two children, Andy and Bruce. Father's possession started at 6:00 p.m. on the first, third, and fifth Friday of each month and ended at 6:00 p.m. on the following Sunday, and during the regular school year, he also had possession on Thursdays beginning at 6:00 p.m. and ending at 8:00 p.m.

7

Mother was ordered to surrender the children to Father at the beginning of each period of Father's possession at Mother's residence.[4]

## B. MOTHER MOVES TO MODIFY POSSESSION

About a year and a half later, in June 2020, Mother filed a motion to modify the parent–child relationship. This motion and the hearing on it are the prelude—or perhaps the springboard—to Father's later motion for enforcement.

In her motion, Mother alleged that the circumstances of the children had materially and substantially changed but did not specify how they had changed. Mother stated that she believed that she and Father would reach an agreement, but if she and Father did not reach an agreement, she requested that (1) she have the exclusive right to consent to the children's psychiatric and psychological treatment, (2) Mother and Father's current co-parenting counselor be discharged, and (3) Father's possession and access to the children be by mutual agreement only or, alternatively, his possession and access be limited to no more than forty-eight consecutive hours at a time:

> The circumstances of the children, a conservator, or other party affected by the order to be modified have materially and substantially

---

[4]Each parent also had the right of first refusal: "IT IS ORDERED that each parent shall have the right of first refusal to care for the children when the parent with possession of the children will be away from the children overnight (the 'absent parent'), with 'overnight' defined as between the hours of 10:00 p.m. and 6:00 a.m." The trial court found that Mother had violated this provision too, but because we hold that the contempt order is valid based on the first violation, we need not address the merits of the right-of-first-refusal finding.

8

changed since the date of the signing of the mediated settlement agreement on which the order to be modified is based.

[Mother] believes that the parties will enter into a written agreement containing provisions for modification of the order providing for conservatorship, possession, and access of the children. If such agreement is made, [Mother] requests that the Court confirm and adopt the agreement of the parties, find the agreement is in the best interest of the children and render the agreement as the Order of the Court.

If agreement is not reached, [Mother] requests that the orders currently in place be modified in the best interest of the children. Specifically, [Mother] requests that the Court enter an order granting her the exclusive right to consent to psychiatric and psychological treatment of the children and discharging Dr. Siegel from his current role as co-parenting counselor for the parties. [Mother] further requests that the Court modify the terms for possession of and access to the children such that [Father's] possession times be by mutual agreement of the parties, or in the alternative, entering a modified possession schedule that provides [Father] with periods of possession that do not exceed more than forty-eight consecutive hours per period taking into consideration the wishes and needs of the children and the circumstances of the parties.

### C. THE HEARING ON MOTHER'S MOTION

At the June 23, 2021 hearing on Mother's motion, Father called Dr. Linda Threats, who had a Ph.D. in clinical social work and a master's degree in social work. Dr. Threats had engaged in counseling with Andy, Bruce, Father, and Mother for about one year from late 2017 until late 2018 with the goal of reuniting the two boys with their father.

Dr. Threats addressed why the boys were estranged from Father:

[Father's attorney] Q. . . . And can you tell us just generally how the process went during the year in reunification counseling, just how did it start, what were the issues during the middle, and how did it end?

9

A.   It began in terms of just getting an understanding of the dynamics between the parents, which was severely conflictual.  It was -- between the parents, it was really a money issue.  The children were estranged in that they saw the father as the problem.  The father's job kept him away frequently, which did not help the process, which again created a lot of emotional distance and just -- and not a -- and lack of attachment.  The mother was overly involved with the children, and the children were heavily influenced by her.

. . . .

[Father's attorney] Q.  . . .  Did you ever find anything that the children disclosed to you that justified their concern, their estrangement with their father?

A.   They were not really able to be specific.  And it's not something new to me.  I think other people reviewing notes have said the same thing.  They were -- they thought he was mean, and when they say mean, they were kind of vague in terms of the feelings that they had: "He takes my phone."  Or[,] "[H]e makes me go to my room.["]   "I don't like his food."  So those were the kinds of things, nothing that I would consider that was a -- a danger to the children or out of the ordinary necessarily for his temperament.

On cross, Dr. Threats elaborated,

[Mother's attorney]  Q.  You mentioned previously one of the problems in the relationship between [F]ather and the boys was a lack of attachment?

A.  Yes.

Q.  Can you explain a little further what you mean?

A.   The children became very -- were having a lot of difficulty with their father.  Emotionally they saw him as a very negative person.  They saw him as mean.  They were angry with him.  But, again, when you tried to get them to be more specific, it was not completely clear.  It was kind of vague.

Over Dr. Threats's year of involvement, she estimated that she had engaged in over twenty sessions with the family and that she interacted separately with Father about twelve times to teach him "Love and Logic." Father completed the "Love and Logic" counseling.

Dr. Threats also had one-on-one sessions with Mother. From these sessions, Dr. Threats discovered that Mother was attempting to barter access to the children in exchange for more financial help from Father:

> Q. What did [Mother] tell you about her willingness to be a part of the solution?
>
> A. When we began the process, she was quite open to it. She also talked to me about a level of trust that she had with me.
>
> Q. . . . And how did that change if at all?
>
> A. It changed over a period of time in relationship to not being able to address the position that she was in.
>
> Q. . . . And did she ever tell you about what she was looking for in exchange?
>
> A. She was very clear, and I think Ms. Shultz [(the children's counselor)] was a part of that meeting when that occurred too. It was a financial issue, and I believe she said if he would take care of the finances, then she would support him.
>
> Q. What type of finances did you believe that she was talking about at the time?
>
> A. Because of the litigious nature of court, I believe what she was upset about, if memory serves me correctly, is that she had -- her income had been drained, and she wanted him to replace what she had lost. I think those were -- were her words.

Q. Do you recall where these children went to school?

A. They were in private schools.

Q. . . . And do you recall the agreement that the parties had had at the time regarding the payment of private-school tuition?

A. He was going to be responsible for that, and there were a couple of issues up and down with the private schooling.

Q. . . . And was private-school payment one of the financial issues that you believe that [M]other was concerned about?

A. Absolutely.

Q. . . . So is it your opinion that the mother's involvement changed to the effect of she didn't want to help facilitate the access between [F]ather and child[ren] unless he continued to pay for things?

[MOTHER'S COUNSEL]: Your Honor, I'm going to object to leading.

THE COURT: Sustained.

Q. (BY [FATHER'S COUNSEL]): Dr. Threats, what was it that [M]other was looking for in exchange for cooperation?

A. She said that she wanted him to keep the kids in school and address the financial concerns.

Q. And how did her participation change when [Father] pulled back on some of those financial commitments?

A. It increased her frustrations with him.

Q. . . . And did it impact the -- your ability to reunify the children and their father?

(Brief pause)

A. I'm -- I'm trying to address the question. I think her -- her frustration and the children's sensitivity to her would have definitely had to have played a role in the backing.

Q. Did you find that the children were aware of financial issues between the parents?

A. Yes.

Q. . . . Were there other matters that the children had knowledge of that were concerning to you?

A. The parents' relationship.

Q. . . . And what were the children aware of that were discussed with you in counseling?

A. They blamed the father for -- for leaving the mother.

Dr. Threats also discussed one other matter—a ticklish one—that arose while she was counseling the family. Immediately before Father's period of summer possession, one of the boys made an outcry of sexual abuse against him. The outcry came just as Father's time with the children was about to increase, but as a consequence of the outcry, Father's access was decreased:

Q. . . . And at that time, what was your goal for the children's summer possession with their father?

A. I believe we had reached a -- a schedule where their time would be increased with their dad.

Q. Okay. How did that outcry statement and eventual ruling out [a]ffect the visitation that you were anticipating?

A. It's going to have a major effect.

13

Q. And it was your opinion at that time to not move forward with the visitation because of the outcry?

A. Yes.

In the end, the allegations proved unfounded. Dr. Threats's understanding was that Father had taken a polygraph test, the allegations had been ruled out, and the case had been closed.

When asked how the sexual-abuse allegation was relevant to Mother's behavior, Dr. Threats responded,

> The fact that there was no prior outcry other than at that period in time and the kids had been in counseling and there was a lack of awareness of that level of severity in interactions with the children, I would say that -- that that would be the reason to establish.

Put another way, given the timing and given the lack of any history of sexual-abuse concerns, Dr. Threats suspected that Mother had coached or prompted one of the boys to make the allegations.

Dr. Threats's attempt at reuniting the boys with Father ended unsuccessfully. Dr. Threats explained that her services were terminated; she believed that her counseling had been aborted because Mother had become "disenchanted with [Dr. Threats's] process."

Although the goal of Dr. Threats's counseling was reuniting the boys with Father, Dr. Threats's "process," if continued, would have included Mother. When terminated, Dr. Threats thought that the parties should continue reunification counseling, that Mother should get a psychological evaluation, and that Mother

14

should receive individual counseling: "I would have recommended family systems therapy with the involvement of all four people. I would have recommended that the mother have a psych eval and individual therapy."

Before Dr. Threats left the stand, the trial court asked her one last question:

> THE COURT: Okay. I have a question. You -- you were talking about -- someone asked a question about whether or not you thought reunification basically works, and your response was that when the other parent supports the reunification. And so in everything that you heard before, the question comes down to, in -- in working with this family, did you find that mom supported the reunification of dad with these children?

> THE WITNESS: No, she did not, not in her actions.

At the close of the hearing, the trial court said, "There certainly is not a material and substantial change such that the motion to modify should be granted." Regarding enforcing possession and access, the trial court warned Mother:

> I assure you I put people in jail on a regular basis. Okay? So if either -- anybody thinks that they can do what they want to and then just figure out how -- what to tell the Judge, just realize that's just one of the things I do.

> If you want to get put in jail for not allowing him to see the children, that's fine, but just understand, once every T is crossed and I is dotted on it, in order to make your children decide whether or not they'd like to see their father or do they want to see you in jail, because you're the one that's going to get punished for it. They don't go to jail. You do.

> And if that doesn't change their mind, I don't know. Maybe it's they can't get the driver's license. Okay? He's probably at 15? Was it 15 or 14? Whatever. Soon would have the opportunity to do that. Taking that away might change their tune on whether or not they are willing to be respectful to both parents. There's lots of things that can happen.

15

Just because a kid should have a voice in it, they're not the decision makers. Never should be the decision makers. That's why they can't buy a car.

The trial court added, "You-all never needed to come to court here." Along the same lines, the trial court said, "So I'll say this did not need to happen today, and so really no relief is granted." Bottom line, "I'm denying the motion to modify."

The trial court signed a written order denying Mother's motion on July 27, 2021.

## D. FATHER MOVES TO ENFORCE POSSESSION

Only a week later, on August 3, 2021, Father filed a motion to enforce his possession and access. He alleged one violation: On Friday, July 30, 2021, Father was at Mother's residence to pick up Andy and Bruce at 6:00 p.m., and Mother failed and refused to surrender Andy and Bruce to him.

On October 12, 2021, Father filed an amended motion to enforce his possession and access. He alleged seven violations of the trial court's possession order:

1. On Friday, July 30, 2021, Father was at Mother's residence to pick up Andy and Bruce at 6:00 p.m., and Mother failed and refused to surrender Andy and Bruce to Father at 6:00 p.m. at her residence.

2. On Thursday, August 26, 2021, Father was at Mother's residence to pick up Andy and Bruce at 6:00 p.m., and Mother failed and refused to surrender Andy and Bruce to Father at 6:00 p.m. at her residence.

3. On Thursday, September 2, 2021, Father was at Mother's residence to pick up Andy and Bruce at 6:00 p.m., and Mother failed and refused to surrender Andy and Bruce to Father at 6:00 p.m. at her residence.

16

4. On Friday, September 3, 2021, Father was at Mother's residence to pick up Andy and Bruce at 6:00 p.m., and Mother failed and refused to surrender Andy and Bruce to Father at 6:00 p.m. at her residence.

5. On Friday, September 17, 2021, Father was present at Andy's school to pick him up at 6:00 p.m. after practice and Andy refused to get in Father's vehicle, and Andy was not surrendered to Father.

6. On Thursday, September 23, 2021, Father was at Mother's residence to pick up Bruce at 6:00 p.m., and Mother failed and refused to surrender Bruce to Father at 6:00 p.m. at her residence.

7. From Saturday, September 18, 2021, to Sunday, September 26, 2021, Mother was away from the children overnight and failed to provide notice to Father of her absence so that he could have the right to care for the children during that period pursuant to the right of first refusal.

## E. THE HEARING ON FATHER'S MOTION

To put the testimony in its proper context, Andy and Bruce were not small children. At the time of the November 2021 hearing, Andy was 15 years old, and Bruce was almost 12 years old.

### 1. Portions of the Previous Hearing are Admitted as Evidence

In his case-in-chief, Father introduced those portions of the reporter's record from the June 2021 hearing on Mother's motion to modify that we discussed above— that is, Dr. Threats's testimony and the trial court's warnings to Mother.

Before proceeding, we address a corollary complaint that Mother has with the admission of evidence regarding Mother's motion to modify. Without assigning a separate issue in her petition, Mother contends that the trial court improperly admitted Mother's motion to modify, the order on Mother's motion to modify, and

17

the excerpts from the hearing on Mother's motion to modify. Mother repeats these arguments in her reply brief. Mother's only objection at the hearing was to relevance, which the trial court overruled. We too overrule Mother's complaint because (1) the exhibits were relevant to show whether Mother willfully disobeyed the court's order, (2) the events that were the subject of Father's motion to enforce did not occur in a vacuum, and (3) the struggle over access and possession was a running one. *See* Tex. R. Evid. 401. To the extent Mother argues that the exhibits' probative value was substantially outweighed by the danger of unfair prejudice and confusion of the issues, *see* Tex. R. Evid. 403, Mother did not object on that basis at the hearing, and thus she has not preserved that issue for review, *see* Tex. R. App. P. 33.1.

## 2. Father Testifies

Regarding the first violation, Father testified that he had tried to pick up the children on July 30th at 6:00 p.m. at Mother's residence and that he was not successful. Father also introduced into evidence a calendar for the month of July 2021 that had a red "X" on the date of July 30—the fifth Friday in July.

Elaborating, Father testified about what "frequently" happened when he and Mother attempted to exchange the children. Father explained that when he went to Mother's residence, Mother would walk out, tell Father that she was turning the children over to him, and tell the boys to enjoy their dinner or weekend, after which she would go back inside. At that point, the children typically stood outside and said

18

that they were not going with him, so he talked to them for anywhere from five to twenty minutes. Ultimately though, the boys then went back inside Mother's house.

Father's understanding was that Mother disciplined the boys when they did not go with him and noted one instance when Mother disciplined one child by not allowing him to go to a football or baseball practice. Father acknowledged, however, that he did not know what Mother was telling the boys:

> As I've said to her, I think the main thing we . . . needed to do was to sit down with the kids so they had an understanding that they were going to come and they needed to come. And I think there's a serious lack of communication there. I -- I don't know what she tells them, if she . . . tells them to come. But I think if we all sat down together, I think that's the first and foremost, then they would have a good understanding they needed to come.

On cross-examination, Father admitted that on July 30, Mother brought the children outside when he came to pick them up. He also conceded that on one occasion the boys had their suitcases and backpacks and were ready to go, but he could not specifically recall if that occasion was on July 30 or on another date.

As on direct, Father stated that he had talked to the boys for a while before they went back inside. He added, however, that after the boys went inside, he emailed Mother, and the boys came back outside, where he talked with them again before they eventually went back inside. Father did not recall whether the boys came outside for a third time. Father did not dispute that he had asked the boys to get in the car with him.

### 3. The July 30, 2021 Email Exchange Between Father and Mother

During Father's cross-examination, the trial court admitted into evidence an email exchange between Father and Mother dated July 30, 2021. We present the emails in chronological order, although that is not how they are presented in the exhibit:

### a. Mother at 6:18 p.m.

The boys were delivered to you with their bags for the weekend at 6:01 pm tonight in my driveway. They have been outside[,] [a]nd I have answered my door three times now.

I told you I was turning them over to you and you accepted them verbally and said everything was good.

I have packed them and encouraged them and told them I would see them Sunday night.

I hope y'all have a great weekend.

Thanks

### b. Father at 6:24 p.m.

[T]he kids walked back in again.

I am going to my place so you can drop them off.

They said they are not coming and walked inside.

Not sure what else you would like me to do.

I am still here and will wait a little longer.

Thx

### c. Father at 6:31 p.m.

You did turn them over and they said they were not coming and walked back inside.

They can come with me now or maybe it would be better for them if you dropped them off at my place.

I am still here and about to leave.

I am not sure what else you would like me to do.

You can let me know.

Thx

### d. Father at 9:47 p.m.

I will try again tomorrow morning and pick the boys up at 10. If you would prefer to drop them off[,] you can let me know[,] and I will be home.

If I don't get any response[,] I will be at your residence at 10.

### 4. Mother Testifies

Mother testified about the steps that she has taken to encourage the children to visit Father:

> I punish the boys when they don't respond to him. I punish them when they don't go with him. I have talked with them extensively about trying to make [the] effort with him, to spend time with him, to give him a chance to start somewhere. I have gotten in with Jarrod Hood, who is a professional counselor, to help their anxiety, to help build their relationship. I have also offered alternative places and times for [Father] to pick up the boys to spend time with them.
>
> . . . .

Q. . . . How many times did you send them out -- for -- for Count No. 1, how many times did you send them outside to go with their father?

A. Three.

Q. Have you been encouraging the boys to go with their father?

A. All the time.

Q. What have you done to -- other than the discipline, what have you done to try to encourage the boys to go with their father?

A. I have suggested they go for ice cream. I've suggested they ride to and from practices with him. I've suggested in between their baseball games they go have a snack with him. I have suggested they meet him for dinner. I've suggested he -- they go to breakfast with him.

Mother testified about the punishments that she had given the children for not communicating with or visiting Father and about how the punishments only made matters worse:

A. [Father] had sent me a message that the boys were not responding to his texts or his phone calls, and so I told him that I was going to ask them to respond back to him. I did so [on] several occasions. Then when I circled back with them and found out they had not responded, I took away their iPads and electronics for the weekend after they told me no.

I did the same thing again the next weekend, which would have been -- that would have been September 14th. The same thing happened. They weren't responding to him. They lost their iPads for the weekend, which is how they communicate with their friends.

THE COURT: Slow down. Slow down. Okay?

A. September the 6th weekend was Labor Day weekend. It was to have been [Father's] possession weekend. The boys did not go with him on Friday night as they were supposed to. They lost all privileges

22

for the weekend. They could have no playdates, and they got -- they couldn't do anything on Monday during the holiday because they were home.

Q. (BY [MOTHER'S COUNSEL]) Let's go to September 17th, if you remember it.

A. September 17th is the night that [Bruce] ran away from [Father] after practice to the football game. [Bruce] was punished. He lost his iPad. He lost his Xbox. He lost his PlayStation. And he was not allowed to have friends over that weekend after that.

Q. Now, when he is . . . about to be picked up by his father, had you talked to him ahead of time about going with his father when he picks him up?

A. Yes, I had.

Q. What did you tell him?

A. He could absolutely not get in a car with anyone else except his father after practice.

Q. Have you told him that before?

A. Yes.

Q. Have you told him that when you have arranged with [Father] to pick up the boys even when it's not his period of possession?

A. Yes.

Q. How many times has that happened, if you know?

A. At least four to five.

. . . .

Q. . . . On October 21st, did you discipline either one of your kids?

23

A.  Yes.

Q.  What was that one about?

(Long pause)

Q.  I'm taxing your memory, and I'm sorry.

A.  You are.

Q.  Let's go to October 22nd.

A.  October 22nd I know was a Thursday night, and I know that [Bruce] had a baseball practice which was to start at, I believe, 6:30 that night.  And he was told when I turned him over, if he did not ride with his father, he would not be allowed to go.

Q.  Did he ride with his father?

A.  He did not.

Q.  Did you not allow him to go?

A.  Did not [sic] allow him to go.  And [Andy] also lost his (unintelligible) --

THE REPORTER:  I'm sorry.  Lost his what?

A.  His privileges to play Oculus and Fortnite.

Q.  (BY [MOTHER'S COUNSEL])  October 28th, did you discipline them October 28th?

A.  Yes.

Q.  What did you do then?

A.  [Bruce] was not allowed to go to either his baseball practice or his football practice, and [Andy] lost his electronics for the entire weekend.

24

Q. Are the punishments working?

A. No.

Q. Are they -- are they -- are they starting to move your kids in the right direction or the opposite -- opposite direction?

A. No. They're doing exactly what we would want them not to do. They're just making --

[FATHER'S ATTORNEY]: Objection; nonresponsive after they're doing what they're not supposed to do.

THE COURT: Sustained.

Q. (BY [MOTHER'S ATTORNEY]) What are they doing?

A. Becoming more upset and angry with their father.

Q. Have you told your children what the Judge told you to tell them? Have you told them if you don't go, I'm going to jail?

A. Yes.

Q. Now, did you tell them about this action that their father had filed a motion for enforcement or anything?

A. No.

Q. Okay. Now, who have you -- I think you said that you've gotten yet another counselor. Who did you get?

A. Jarrod Hood.

Q. Have -- have you met with Jarrod?

A. [Father] and myself have met with him three times, and the boys have met with him -- no, we met with him twice --

Q. Okay.

25

A. -- and the boys have met three times.

At the close of the hearing, the trial court made no oral ruling. On November 29, 2021, the trial court made its email ruling. And on January 4, 2022, the trial court signed its contempt-and-commitment order.

## IV. DISCUSSION

Contempt of court is defined broadly as disobedience to or disrespect of a court by acting in opposition to its authority. *Ex parte Chambers*, 898 S.W.2d 257, 259 (Tex. 1995) (orig. proceeding). Contempt of court falls within two basic types: direct contempt and constructive contempt. Direct contempt is that type of disobedience or disrespect that occurs within the court's presence, while constructive contempt occurs outside the court's presence. *Id.* The contempt alleged in this case—violation of a written court order outside the court's presence—is constructive contempt. A criminal contempt conviction for disobeying a court order requires proof beyond a reasonable doubt of: (1) a reasonably specific order; (2) a violation of the order; and (3) the willful intent to violate the order. *Id.* In reviewing the record, we determine only if the judgment is void because, for example, no evidence supports the contempt finding. *Id.* at 259–60. We do not weigh or reweigh the evidence. *Id.* at 259.

Initially, we note that for contempt purposes, the children's desires do not override an order: "[The mother] identifies no legal authority, and we have found none, that takes consideration of a child's desires to the extreme of granting that child—no matter how mature—complete discretion over possession by a parent."

*In re S.V.*, 599 S.W.3d 25, 37 (Tex. App.—Dallas 2017, pet. denied) (op. on reh'g) (footnote omitted).  For other purposes and in other proceedings, the children's desires might be relevant.  *See* Tex. Fam. Code. Ann. §§ 153.134(a)(6), 156.101(a)(2) (both providing that a child must be at least twelve years old before the child's preference, if any, regarding the person to have the exclusive right to designate the child's primary residence becomes a factor).  Nothing in the trial court's possession-and-access order gave the children a veto right.

In Mother's first issue, she contends that she "surrendered" the children when she left the boys outside and thus complied with the possession-and-access order.  Mother has some authority in her favor.  In a case decided with similar facts, the Beaumont Court of Appeals wrote,

> [The mother] left [the children] outside the house, and by doing so, she subjected the children to [the father's] authority over them.  Nothing in the record shows that [the mother] encouraged the children not to go with [the father].  Because no evidence supports the trial court's finding that [the mother] willfully failed to surrender the children to [the father], the trial court's order holding her in contempt based on her alleged failure to surrender the children to [the father] . . . is void.

*In re Miller*, No. 09-18-00253-CV, 2018 WL 4138980, at *3 (Tex. App.—Beaumont Aug. 30, 2018, orig. proceeding) (mem. op.).

We are not persuaded.  "Surrender" is defined as "to yield to the power, control, or possession of another upon compulsion or demand" or "to give up completely or agree to forgo especially in favor of another."  *Surrender*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/surrender

27

(last visited Feb. 14, 2022). Letting the children remain in Mother's house—thwarting Father's possession—irreconcilably conflicts with her obligation to surrender the children to Father. Getting the boys into Father's car was Father's problem. Mother made Father's problem infinitely greater by letting the children back into her house. To put it colloquially, regardless of whether Mother talked a good game, her actions showed that she was not a team player. The moment Mother allowed the children to remain in her house, she interfered with Father's possession. If the boys were in her house after 6:00 p.m., Mother had surrendered nothing. *Cf. In re Koomar*, No. 09-20-00114-CV, 2020 WL 5805571, at \*2–3 (Tex. App.—Beaumont Sept. 30, 2020, orig. proceeding) (per curiam) (mem. op.) (holding that the mother surrendered the child when (1) she arrived at the airport on time with the child, (2) the child refused to leave the mother's vehicle for fifty minutes, and (3) the child left the vehicle and successfully caught a flight with the father).

To hold otherwise invites gamesmanship. Hypothetically, Mother could not leave the children at the curb for Father and wash her hands of the matter. Mother was not ordered to simply surrender the children; she was ordered to surrender the children to Father. By the end of the evening, Mother still had possession of the children. No construction of the trial court's order contemplates Mother having possession of the children after 6:00 p.m. Thus, we overrule Mother's first issue.

28

In Mother's second issue, she attempts to make the children's desires relevant by arguing that, assuming she failed to comply with the possession-and-access order, her noncompliance was involuntary because the children refused to go with Father.

The involuntary inability to comply with an order is a valid defense to criminal contempt because noncompliance cannot have been willful if the failure was involuntary. *Chambers*, 898 S.W.2d at 261. Although the inability-to-comply defense technically rebuts contempt's willfulness element, the relator bears the burden of proving her inability to comply. *Id.* Again, we do not weigh the evidence; we only determine if there is any evidence to legitimize the relator's confinement. *Id.* at 261–62. To succeed, the relator must establish conclusively that her noncompliance was involuntary. *See id.* at 262.

As with her previous argument, Mother has authority supporting this contention. In dictum, the Amarillo Court of Appeals wrote,

> [The mother] would be subject to contempt proceedings if she overtly or covertly sought to impede [the father's] taking possession of the children for his visitation. However, in this case, the trial judge did not find that she acted in such a manner. Rather, his finding was that [the mother's] passive conduct amounted to a denial of visitation. The evidence shows that [the mother] did have the children and their baggage present at the agreed location for [the father] to take possession of them. Under this record, [the mother's] passivity was not punishable by contempt.

*Ex parte Morgan*, 886 S.W.2d 829, 832 (Tex. App.—Amarillo 1994, orig. proceeding).[5] Mother stresses that she encouraged the boys to go with Father. *See id.*

Once again, we are not persuaded. Regardless of what Mother told Father, the trial court, or the boys, Mother gave the boys the option of staying with her. Mother's actions communicated her position—the children did not have to go with Father if they did not want to. And unlike the *Morgan* and *Miller* courts, the trial court here had evidence to suggest that Mother was sabotaging Father's access to the children.

As the factfinder, the trial court could choose to believe all, some, or none of the evidence. *In re C.F.*, 576 S.W.3d 761, 774 (Tex. App.—Fort Worth 2019, orig. proceeding). The factfinder may believe one witness and disbelieve others. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). Provided the trial court's factual determinations have evidentiary support, we defer to the trial court. *C.F.*, 576 S.W.3d at 768.

In an original mandamus proceeding, appellate courts do not question the trial court's credibility determinations. *In re Hightower*, 580 S.W.3d 248, 255 (Tex. App.—Houston [14th Dist.] 2019, orig. proceeding). Illustrating this principle in a habeas context, where the standard is the same, is *Ex parte Rosser*, a case in which the evidence pointed in one direction (involuntary noncompliance), but the trial court

---

[5]The court in *Morgan* granted the mother habeas relief on other grounds. *See id.* Despite that, the court addressed whether the mother had delivered possession of the children because the parties had requested guidance, because of the paucity of authority on the question, and because the court thought it likely that the issue would reoccur. *See id.*

ruled in another (voluntary noncompliance). *See* 899 S.W.2d 382, 386 (Tex. App.—Houston [14th Dist.] 1995, orig. proceeding) (stating that "the trial court is allowed to judge the credibility of the witnesses and the weight to be given their testimony" and that "[a]n appeals court may not substitute its judgment for that of the trial court as trier of fact"). The appellate court reconciled the apparent dichotomy on the basis of credibility—or the lack thereof:

> All of the evidence in the record indicates that [the father] encouraged the visitation and did what he could to convince his seventeen-year-old daughter to see her mother. The testimony from the hearings on August 4 and December 1 shows that [the daughter] steadfastly refused to go and threatened to run away if she was forced to visit her mother. Neither being punished herself nor having her father found in contempt dissuaded her. There is no evidence in the record that [the father] overtly or covertly sought to impede or discourage the visitation.

> [The mother], however, argues that [the father] was ordered to "deliver" the child, which required him to take overt action to comply. She complains that [the father] failed to do so, and that his only justification was that the child did not want to go.

> Within the spectrum of visitation disputes, there may be instances in which: (1) a parent actively discourages or impedes visitation; (2) a parent passively fails to insist that a child comply with visitation;[6] or (3) a parent is legitimately unable to compel a child to comply with visitation. We believe that the defense of involuntary inability to comply applies only to the third alternative, and not the first two.

> As a practical matter, a trial court might be presented with evidence like that in this case in any of the three situations above. If such evidence must always be taken at face value to negate contempt, the ability of the courts to enforce visitation could be weakened

---

[6] *See Passive-Aggression*, Psychology Today, https://www.psychologytoday.com/us/basics/passive-aggression (last visited Feb. 14, 2022).

31

considerably. The safeguards to prevent that result are that the relator has the burden to conclusively prove involuntary inability, and that the trial court is allowed to judge the credibility of the witnesses and the weight to be given their testimony.

As trier of fact, a trial court is not bound by the testimony of an interested witness merely because it is uncontradicted. Instead, testimony by an interested witness may establish a fact as a matter of law only if the testimony could readily be contradicted if untrue, and is clear, direct and positive, and there are no circumstances tending to discredit or impeach it. An appeals court may not substitute its judgment for that of the trial court as trier of fact.

In this case, [the father] had the burden to prove his involuntary inability to comply with the visitation order. His and [the daughter's] testimony were to the effect that he tried to persuade her to visit her mother, but because she refused, he was unable to do so.

However, [the father] and [the daughter] were interested witnesses, and their testimony could not readily be contradicted if untrue. Thus, the trial court was not bound by this testimony if it disbelieved it, and we may not substitute our judgment for that of the trial court on that determination. The contempt order stated that [the father] had the ability to comply with the visitation order, and, by implication, that he had not conclusively established his involuntary inability to comply. Therefore, as to [the father's] first and second complaints, the order did not deprive [the father] of his liberty without due process of law.

*Id.* at 385–86 (footnotes and citations omitted).

More recently, the First District Court of Appeals addressed a mother's argument that she could not transport her son to counseling sessions because he refused to go:

The mother asserts that her son is a 17-year-old, 6-foot-tall football player, and she is unable to force him to attend counseling sessions if he refuses. Both the mother and her son both testified that the son refused to attend the September 7 session, despite the mother's

admonitions that he must do so. The child further testified that, after telling his mother that he would not go to the session, he took the car and left the house.

*In re White*, No. 01-18-00073-CV, 2018 WL 2305524, at *4 (Tex. App.—Houston [1st Dist.] May 22, 2018, orig. proceeding) (per curiam) (mem. op.). The trial court found the mother in contempt, and the court of appeals did not disturb the trial court's finding:

> In this case, the evidence supporting the defense of involuntary inability to comply came from the mother and her son, who were both interested witnesses and whose testimony could not be readily contradicted if it was untrue. Therefore[,] the trial court was not bound by the testimony if disbelieved, and this court may not substitute its judgment for that of the trial court. The trial court determined that [the mother] had the ability to comply, implicitly finding that [she] had not conclusively established her involuntary inability to comply.

*Id.* (citations omitted). The trial court in our case made a similar finding: "The Court further finds that on the day of this hearing [Mother] had the ability to comply with the prior order of the Court."

Put more bluntly, the trial court was free to disbelieve Mother and to conclude that she had engaged in a dog-and-pony show for Father's and the trial court's consumption that was designed to shield her from contempt findings. *See id.*; *Rosser*, 899 S.W.2d at 386. The trial court had already made it clear to Mother that the boys risked nothing by refusing to go with Father but that Mother did, and Mother stated that she had warned the boys that she could go to jail if they refused to go with Father. Despite the trial court's warning to Mother and despite Mother's warning to

33

the children, Mother testified that the boys refused to go with Father, presumably meaning that they were willing for Mother to go to jail rather than go with Father. This would have been a curious choice if the boys' goal was to stay away from Father because once Mother went to jail, they would likely go straight to Father's home based on his right of first refusal. Mother's and the boys' actions show that they potentially discounted the possibility of Mother's going to jail for contempt.

Furthermore, if Mother feared being held in contempt because the boys refused to honor the possession-and-access order, presumably Mother would have filed a motion to modify based on a material and substantial change in the children's circumstances. Although Mother filed a motion to modify, she did not allege that the children were refusing to visit Father. And in her motion to modify, Mother's proposed solution was not to work toward ensuring that the boys visited Father but was to make Father's visits contingent on her approval—which, given the history, would have left Father's possession rights in an extremely precarious position. *See S.V.*, 599 S.W.3d at 37 ("Courts have concluded that giving one parent sole authority over the other parent's possession of a child can effectively deny access to the child. Moreover, placing all control over possession in one parent's discretion leaves the other parent without the remedy of contempt if possession is denied." (internal citation omitted)). If the boys truly refused to go with Father, and if Mother was truly concerned about being held in contempt for the boys' refusal, the trial court as

34

factfinder could have reasonably concluded that Mother would have broached that subject in her motion to modify, but she did not.

The trial court's ruling shows that it did not believe Mother, and Dr. Threats's testimony gave the trial court an evidentiary basis for this belief. At the previous hearing, Mother's commitment to uniting the children with Father was contradicted considerably by Dr. Threats, who (1) thought that Mother was using the children as pawns to extract more financial help from Father, (2) suspected that Mother was behind the unfounded sexual-abuse allegations that adversely impacted Father's summer possession, (3) believed that Mother had terminated her services when Dr. Threats wanted her to get a psychological evaluation and to receive individual counseling, and (4) stated that Mother's actions belied any support for building a relationship between the boys and Father.

Thus, because the trial court was the sole judge of Mother's credibility and demeanor and because other evidence supported the trial court's factual determination that Mother's noncompliance was voluntary, we overrule Mother's second issue. *See Chambers*, 898 S.W.2d at 259; *Rosser*, 899 S.W.2d at 386.

Because we have determined that the evidence supports the trial court's contempt finding on the first violation, because the trial court assessed separate punishments for each of the six violations, and because the trial court assessed the same punishment for each violation and ordered them to run concurrently, we need not address Mother's first and second issues as they apply to violations two, three,

35

four, and six or Mother's third issue as it applies to violation seven. *See generally 1717 Bissonnet, LLC*, 500 S.W.3d at 496; *McDaniel*, 887 S.W.2d at 170–71.

Turning to Mother's fifth and last issue, she asserts that the award of attorney's fees is void because the judgment of contempt is void. *See Ex parte Fernandez*, 645 S.W.2d 636, 639 (Tex. App.–El Paso 1983, orig. proceeding) (per curiam) ("Any attorney's fees based upon that void order must also be void."). Because we hold that the contempt-and-commitment order is valid, we overrule Mother's fifth issue.

## V. CONCLUSION

We deny Mother's petition for writ of mandamus. Our stay will remain in place for fifteen days after the date of this order, at which time it will expire automatically unless Mother files a timely motion for rehearing. *See* Tex. R. App. P. 52.9. If Mother files a timely motion for rehearing, our stay will remain in place until further order of this court. We will not entertain a motion to extend time to file a motion for rehearing. *See id.*; *see also* Tex. R. App. P. 49.4.

/s/ Brian Walker

Brian Walker
Justice

Delivered: February 17, 2022

36