

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| STEVEN L. BRUINGTON and NANCY BRUINGTON, | § | No. 08-23-00015-CV |
| | § | Appeal from the |
| Appellants, | | |
| | § | 456th Judicial District Court |
| v. | | |
| | § | of Guadalupe County, Texas |
| CHESMAR HOMES, LLC and YANTIS CORPORATION, | § | (TC# 22-1755-CV-E) |
| Appellees. | | |

## MEMORANDUM OPINION

This case arises out of Appellees' actions in developing a subdivision adjacent to Appellants' home, which Appellants alleged damaged and substantially interfered with the use and enjoyment of their property. After Appellants sued for nuisance and negligence, Appellees moved to dismiss the lawsuit, arguing that the trial court lacked subject matter jurisdiction because Appellants' claims were not ripe for review. The trial court agreed and dismissed Appellants' lawsuit in its entirety. For the reasons set forth below, we affirm.[1]

---

[1] This case was transferred from the Fourth Court of Appeals pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001. We follow the precedent of the Fourth Court of Appeals to the extent it might conflict with our own. *See* TEX. R. APP. P. 41.3.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Bruingtons' lawsuit

Appellants Steven L. Bruington and Nancy Bruington (the Bruingtons) are homeowners in a neighborhood adjacent to the Guadalupe River on Lake McQueeney in Guadalupe County, Texas. Their home is a neighbor to Three Oaks, a 45-to-50-acre housing subdivision being developed by Appellee Chesmar Homes LLC, using Appellee Yantis Corporation as the general contractor (collectively, Chesmar Homes). In an earlier proceeding, before the subdivision construction began, the Bruingtons sued Chesmar Homes, LLC and KFW Engineering, the firm that designed the drainage plans, alleging the development would create a nuisance, as they believed the plans would lead to flooding in the area. The trial court dismissed that lawsuit as not yet ripe for review because the Bruingtons could not establish they had suffered a concrete injury at that time.[2]

After construction began, the Bruingtons filed the current lawsuit against Chesmar Homes, raising two broad complaints. First, the Bruingtons renewed their argument that Chesmar Homes was negligent by failing to develop adequate plans to "provide for the proper drainage and retention of flood and rain waters" to ensure that any runoff from the development site would not be "any greater than is currently being experienced." According to the Bruingtons, the plans were below the "minimum requirements" to prevent such runoff, thereby posing a future flooding threat to their property.

Second, the Bruingtons alleged Chesmar Homes had spread a large amount of "limestone/caliche" material on the development site and failed to take proper precautions to

---

[2] It does not appear that the Bruingtons appealed from that decision.

2

prevent the related dust particles (caliche dust) from blowing onto their property. According to the Bruingtons, the caliche dust's "abrasive" nature caused damage to their property, including their "vehicles and other surfaces." They further alleged that the caliche dust contained crystalline silica, a known carcinogenic that was threatening their health.[3]

The Bruingtons pleaded negligence, gross negligence, private and public nuisance, and intentional infliction of emotional distress, seeking both compensatory and punitive damages. They also requested a temporary restraining order and injunctive relief precluding Chesmar Homes from continuing to develop the subdivision until they took steps to "properly suppress the abrasive limestone/crystalline silica" and rewrite their retention pond plans to "guarantee that their development will cause no more downstream flooding" than when the site was undeveloped. And finally, they requested a declaratory judgment "finding that the Defendants are required to remediate" the development site to address the dust and runoff issues.

**B. Chesmar Homes' motion to dismiss for lack of subject matter jurisdiction**

Chesmar Homes filed a motion to dismiss, alleging the trial court lacked subject matter jurisdiction to hear the Bruingtons' lawsuit, as their claims were still not ripe for review. According to Chesmar Homes, the Bruingtons still could not demonstrate that they had suffered any damage to their property or that Chesmar Homes' actions had substantially interfered with the use and enjoyment of their property. Chesmar Homes further sought dismissal of the Bruingtons' claim that their health was in danger from the crystalline silica they believed was in the caliche dust due

---

[3] The Bruingtons also alleged Chesmar Homes' traffic plans, which called for a "road cut" onto their street from the development site, would create a nuisance, expressing concern about an "adverse and unsafe effect on the traffic patterns" in the area. However, the trial court ruled against the Bruingtons on this issue at the start of the evidentiary hearing on Chesmar Homes' motion to dismiss, and the parties did not present any evidence on the traffic issue at the hearing. The Bruingtons do not address the traffic issue in their appellate briefing, and we therefore do not address it.

3

to their failure to file a "medical certification." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 90.004 (a) (providing that a "claimant asserting a silica-related injury must serve on each defendant a report" by a particular type of physician verifying that the claimant is suffering from a silica-related disease).

The Bruingtons, in turn, asserted that they had already suffered damages, including the "diminution in value" of their home and deprivation of use and enjoyment of their property due to the dust blowing onto their property from the development site. The Bruingtons also argued that they had sufficiently alleged the possibility of future damages to both their property and their health, which they believed was sufficient to warrant injunctive relief. Finally, they contended that the injunctive relief they requested did not require them to produce a medical certification.

### C. The evidentiary hearing

The trial court held an evidentiary hearing on the Bruingtons' request for a temporary injunction and Chesmar Homes' motion to dismiss for lack of jurisdiction. Each party presented only one witness, whose testimony is described below.

#### (1) Chesmar Homes' evidence

Chesmar Homes' witness, Burt Wellman, is a licensed civil engineer employed by KFW Engineers, which had been retained by Chesmar Homes to prepare the subdivision drainage plans. Wellman explained that in 2021 and 2022, his company submitted two storm water management plans to the City of Seguin (the City) relating to two phases of the development, both of which plans the City had approved. The plans were admitted into evidence without objection. Wellman testified that the plans addressed various "drainage-related items" and used the City standards to calculate the size and number of retention ponds needed for the development site to ensure there would not be any increased "flow" of runoff water from the development site to other properties

4

in the area beyond the "existing conditions." Wellman further testified that the approved plans were designed to redirect any runoff water away from the Bruingtons' property, which he believed would actually decrease the risk of any potential flooding on their property.

Wellman acknowledged that Yantis Corporation was responsible for the retention pond construction described in the approved plans, subject to the approval of a City inspector. Wellman testified that he believed the retention pond construction had begun, and on cross-examination, he acknowledged that although he was confident in the plans, there was a possibility the retention ponds were not being constructed in accordance therewith and/or did not meet the City's expectations. The Bruingtons' attorney showed Wellman a video of a "rain event" Steve Bruington filmed on August 31, 2022, approximately two weeks before the hearing, which Wellman acknowledged showed drainage coming off the development site into a nearby drainage ditch. He testified, however, that he was not at the site at the time and could not ascertain from the video if there were any issues with the retention ponds or the drainage system.

The Bruingtons' attorney further questioned Wellman about dust issues, showing him a series of undated videos taken by Steven Bruington, which Wellman described as showing excavators moving dirt at the site and causing dust to blow in the air. Wellman testified that although he was not a contractor and had no expertise in the area, he did not believe the amount of dust shown in the videos was "unusual." Wellman further testified that he had no knowledge of what was in the dust in the videos or how long any of the dust events lasted, but he never observed any dust settling on the Bruingtons' property while he was at the development site. Wellman was also shown two undated videos depicting mounds of fill dirt at the development site, but Wellman testified that he did not know the composition of the dirt, and in particular, whether it contained silica.

5

Again disavowing expertise in the area, Wellman testified that he believed it would be a "good practice" to apply water to any excavation area and to "compact the materials . . . to suppress as much of the dust as possible," but he was unaware of whether Chesmar Homes was doing so. And he further acknowledged he did not see any compaction equipment or water being applied during the footage of the videos he was shown.

**(2) The Bruingtons' evidence**

Appellant Steven Bruington (Bruington) testified that he and his wife, Appellant Nancy Bruington, live approximately 16 to 20 feet "downstream" from Chesmar Homes' development site, an approximately 50-acre parcel previously used for farming during the 17 years they had lived there. He testified that Chesmar Homes began developing the site approximately two to three months before the hearing, and during that time, he witnessed "some large earthmovers" at the site, some "clearing of the land," and "some excavation." The Bruingtons' attorney then played the same series of undated videos that had been shown to Wellman, which Bruington narrated as depicting "earth-moving machines" moving dirt and causing "quite a bit of dust" to blow around on the development site. In addition, Bruingtons' attorney played another video Bruington had filmed on an undisclosed date, which Bruington described as depicting a "whirlwind that came through and picked up the dust" from the development site, blowing dust in the opposite direction from their home, across a nearby highway. Bruington further testified he had seen "whirlwinds" blowing dust in the area "several times" but did not specify how many times he had seen them, when they occurred, or how many times, if any, the dust from the whirlwinds impacted their property.

The Bruingtons' attorney next played two videos Bruington claimed demonstrated dust from the development site had settled on their property. Bruington testified that the first video,

6

which he filmed on August 10, 2022, was shot after a "dust storm that blew off of the Chesmar property across the street, through [their] property, [their] neighbor's property, and . . . down to the river." He described the video as depicting "a lot of dust" blowing onto their property from the direction of the development site. While the video was playing, Bruington described seeing "white dust" deposited on a wood deck on the side of their house as well as on their driveway and their vehicles. Bruington testified that the second video depicted dust that had collected on their driveway. However, this video is undated, and it is not clear from the record if it was taken after the same dust event depicted in the first video or if it was filmed on a different date.

When asked if he and his wife had suffered any property damage from the blowing dust to date, Bruington testified they had to have their vehicles washed after the dust settled. He acknowledged that he had "not inspected" them for damage but feared they could be scratched in the future due to the abrasive nature of the dust from the development site. [4]

When asked whether he had ever seen Chesmar Homes put water on the dirt to prevent the dust from blowing off the site, Bruington acknowledged he had seen "a small water truck there" and had also seen "water being taken from [a] fire hydrant over to a YANTIS tank" on the development site. In addition, he recalled Chesmar Homes later bringing a larger water truck to the site "with a spreader bar," but he averred he had never seen them use "any rollers" to "compact" the materials at the site. According to Bruington, he had not seen Chesmar Homes place any water on the ground to suppress the dust in the last two or three weeks before the hearing but acknowledged recent rain that "settled the dust temporarily." He further acknowledged he had not seen the earthmovers that had been stirring up the dust on the development site for at least ten to

---

[4] Our review of the videos does not reveal any physical damage to the property; instead, at most, they appear to depict an indeterminate amount of dust on the property.

14 days before the hearing, and he was unaware of the construction schedule or when the earthmovers might return to the site.

Bruington testified that although the dust had not affected his property "for a while," he and his wife decided to collect samples "taken off the ground" at an unspecified location and date to send to a lab to determine the dust's composition. According to Bruington, the report they received demonstrated that the dust sample contained "silica" and that it was in "excess of 20 percent quartz."[5] Bruington testified that he believed "silica is dangerous," and he claimed he was unable to go outside and safely enjoy his property because of his fear of silica exposure. Bruington, however, acknowledged he had no expertise to determine what level of exposure to silica would be safe, and he and his wife had not seen a physician to determine if they had been affected by any such exposure.

And finally, in addressing the potential for flooding on the property, the Bruingtons' attorney played the same video of the rainfall event he had shown to Wellman, which Bruington testified he took after a rainfall of "plus or minus one and a quarter inch rain." Bruington testified that the video depicted "chalky white" colored water running off the development site into a county ditch road, which he believed was the same color as the dirt located on the development site. He acknowledged, however, that the runoff did not come onto his property during that incident. And although Bruington opined that the retention ponds at the development site were not functioning correctly and posed a flooding danger, he acknowledged there had been no flooding on their property to date.

---

[5] The Bruingtons did not introduce the report into evidence as an exhibit at the hearing, and the report is not part of the appellate record.

8

**D. The trial court's ruling**

Stating it had not heard any evidence of damage that would warrant issuing injunctive relief, the trial court indicated its intent to deny the request for a temporary restraining order. However, the trial court gave the Bruingtons the opportunity to "supplement" with additional evidence of their damages, if they had any. And although the trial court voiced its inclination to allow the nuisance claim to "survive" Chesmar Homes' challenge, it cautioned the parties it was not making any "firm rulings" that day because it needed additional time to review the pleadings and evidence. The parties were directed to present a "summary" of their arguments to help the court make a decision.

After receiving the parties' argument summaries, the trial court issued a series of orders. It granted Chesmar Homes' motion to dismiss for lack of jurisdiction without prejudice and denied the Bruingtons' request for a TRO and injunctive relief. The trial court also issued a separate order dismissing the Bruingtons' "silica related injury" claims, pursuant to Section 90.007 of the Texas Civil Practices and Remedies Code. The Bruingtons appealed the trial court's order granting Chesmar Homes' motion to dismiss and denying their request for injunctive relief. They did not challenge the dismissal of their silica-related health claims, nor do they address it in their appellate briefing.

In one global issue on appeal, the Bruingtons contend the trial court erred in dismissing their "claims against [Chesmar Homes] for Injunctive Relief, Declaratory Judgment and Damages Based Upon [Their] Causes of Action for Nuisance and Negligence." We disagree.

9

## APPLICABLE LAW AND STANDARD OF REVIEW

### A. Pleas to the jurisdiction

Although Chesmar Homes labeled their jurisdictional challenge in the trial court a "motion to dismiss for lack of jurisdiction," it was the functional equivalent of a plea to the jurisdiction. Both the parties and the trial court treated it as such, and we do as well. *See In re Elamex, S.A. de C.V.*, 367 S.W.3d 891, 897 (Tex. App.—El Paso 2012, no pet.) (recognizing that a "motion to dismiss based on a lack of subject matter jurisdiction is the functional equivalent of a plea to the jurisdiction"); *Texas Nat. Res. Conservation Comm'n v. White*, 46 S.W.3d 864, 866-67 (Tex. 2001) (treating "Motion to Dismiss for Lack of Jurisdiction Based on Sovereign Immunity" as a plea to the jurisdiction).

Texas courts have long recognized two types of pleas to the jurisdiction. The first is a plea that challenges only the pleadings. In that instance, a court must "determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). However, when a plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court is required to consider any "relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised." *Id.* at 227 (citing *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000)).

When a defendant challenges the trial court's subject matter jurisdiction—whether by a challenge to the sufficiency of the pleadings or to the sufficiency of jurisdictional evidence—it is the plaintiff's burden to raise a genuine issue of material fact to overcome the challenge and avoid dismissal. *Id.* at 221. "When the consideration of a trial court's subject matter jurisdiction requires

the examination of evidence, the trial court exercises its discretion in deciding whether the jurisdictional determination should be made at a preliminary hearing or await a fuller development of the case, mindful that this determination must be made as soon as practicable." *Miranda*, 133 S.W.3d at 227 (citing *Bland*, 34 S.W.3d at 554). When a hearing is held, the trial court must then review "the relevant evidence to determine if a fact issue exists." *Id.* at 227. If the evidence creates a fact issue regarding jurisdiction, the trial court does not rule on the plea, but instead submits the issue to the factfinder to resolve. *Id.* at 227–28. But if the "relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Id.* at 228.

We review a trial court's ruling on a plea to the jurisdiction de novo. *Id.* at 226. When the ruling is made on the basis of jurisdictional evidence, we must "take as true all evidence favorable to the nonmovant" and "indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *City of Waco v. Kirwan*, 298 S.W.3d 618, 622 (Tex. 2009). In making our determination, we do not adjudicate the substance of the plaintiff's claims; our only role is to determine whether the trial court has subject matter jurisdiction to hear the claims, regardless of their merit. *Bland*, 34 S.W.3d at 554.

### B. Ripeness

"Ripeness is an element of subject matter jurisdiction." *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998); *see also Robinson v. Parker*, 353 S.W.3d 753, 755 (Tex. 2011) (recognizing same). Ripeness "is a threshold issue that . . . emphasizes the need for a concrete injury for a justiciable claim to be presented." *Robinson*, 353 S.W.3d at 755 (citing *Patterson v. Planned Parenthood of Hous. & Se. Tex.*, 971 S.W.2d 439, 442 (Tex. 1998)). Whether a claim is ripe for review is a legal question subject to de novo review. *Mayhew*, 964 S.W.2d at 928.

11

In evaluating ripeness, a court must consider "whether, *at the time a lawsuit is filed*, the facts are sufficiently developed 'so that an injury has occurred or is likely to occur, rather than being contingent or remote.'" *Mayhew*, 964 S.W.2d at 928 (citing *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851–52 (Tex. 2000) (emphasis in original)). If a party cannot demonstrate that its claim is ripe for review, or that there is a "a reasonable likelihood that the claim will soon ripen, the case must be dismissed." *Robinson*, 353 S.W.3d at 755 (citing *Perry v. Del Rio*, 66 S.W.3d 239, 251 (Tex. 2001)). "A case is not ripe when its resolution depends upon contingent or hypothetical facts or upon events that have not yet come to pass." *Patterson*, 971 S.W.2d at 443. Thus, where the evidence consists of "mere allegations and speculation," the plaintiff's claim is not ripe. *Robinson*, 353 S.W.3d at 756 (citing *Perry*, 66 S.W.3d at 249 (a case based on "uncertain or contingent future events" is not ripe for judicial determination); *Patterson*, 971 S.W.2d at 444 (a potential injury cannot be ripe unless it is established with certain and definite documentation)).

Ripeness, like other justiciability doctrines, is based in part on "the constitutional prohibition against advisory opinions, which in turn stems from separation-of-powers principles." *Tex. Bd. of Chiropractic Examiners v. Tex. Med. Ass'n*, 270 S.W.3d 777, 781 (Tex. App.—Austin 2008, no pet.) (citing *Patterson.*, 971 S.W.2d at 442). But as the Texas Supreme Court has explained, the concept of ripeness also raises pragmatic concerns, and therefore, a court should be concerned "not only whether [it] *can* act—whether it has jurisdiction—but prudentially, whether it *should.*" *Perry*, 66 S.W.3d at 249–50. Thus, in assessing ripeness, we must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id*. at 250 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

## CHESMAR HOMES' PLEA CHALLENGED THE EXISTENCE OF JURISDICTIONAL FACTS TO DEMONSTRATE RIPENESS

As a preliminary matter, we note that in both the trial court and in their appellate briefing, the Bruingtons contend the trial court was required to decide Chesmar Homes' plea to the jurisdiction based solely on the factual allegations in their pleadings. The Bruingtons' argument in this regard appears to be two-fold. First, they argue that as a general matter, a plea to the jurisdiction may only challenge the plaintiff's pleadings, thus their only burden was to allege sufficient facts, which if true, would support a finding that their claims were ripe. But, as set forth above, it is well-established that a plea to the jurisdiction may challenge the adequacy of the pleadings as well as the evidence to support the alleged jurisdictional facts. *Miranda*, 133 S.W.3d at 226.

Second, the Bruingtons argue that even so, Chesmar Homes' plea did not actually challenge the existence of any of the jurisdictional facts and did not put any of their "jurisdictional facts . . . at issue." The Bruingtons contend they were therefore not required to come forward with any evidence to support the allegations in their pleadings. We disagree. In their plea, Chesmar Homes argued that the Bruingtons had not suffered any "concrete injury" as is necessary to support a finding of ripeness, which in effect challenged the Bruingtons to come forward with evidence to establish the existence of such. Moreover, the Bruingtons were on notice that Chesmar Homes' plea was based on an evidentiary challenge, as they came to the trial court hearing with evidence, in the form of video footage, which they believed demonstrated the ripeness of their claims. The trial court further indicated it was treating the Chesmar Homes' plea as a challenge to the existence

of jurisdictional facts, cautioning the Bruingtons it intended to dismiss the lawsuit in the absence of evidence they had suffered a concrete injury.[6]

Accordingly, we construe Chesmar Homes' plea as a challenge to the existence of jurisdictional facts to support a finding that the Bruingtons' claims were ripe, and we review the record to determine if the Bruingtons met their burden of producing any such evidence.[7]

## NO JURISDICTIONAL FACTS TO SUPPORT THE NEGLIGENCE CLAIMS

We first consider whether the Bruingtons proffered sufficient jurisdictional evidence to support a finding that their negligence claims were ripe for review. We conclude they did not.

### A. Applicable law

The elements of a common-law negligence claim are: "(1) a legal duty; (2) a breach of that duty; and (3) damages proximately resulting from the breach." *Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.3d 137, 144 (Tex. 2022). In determining the ripeness of the Bruingtons' negligence claims, we do not consider the question of whether Chesmar Homes owed a duty to the Bruingtons or whether they breached that duty. Instead, our sole focus is whether the Bruingtons came forward with sufficient jurisdictional evidence to support a finding that they suffered actual damages from

---

[6] As set forth above, the trial court even gave the Bruingtons the opportunity to present additional evidence following the hearing. The record does not reflect that they took advantage of that opportunity.

[7] We note that although the Bruingtons timely requested the preparation of the reporter's record of the trial court's evidentiary hearing, there was some confusion regarding whether the Bruingtons had timely paid the court reporter for either a transcript of the hearing and/or the exhibits presented at the hearing. The Bruingtons filed their appellants' brief before the reporter's record was filed with the Court in part because they believed the trial court's decision should have been based solely on their pleadings rather than on the evidence presented at the hearing, which would have rendered the reporter's record unnecessary to our review. However, after filing their brief, the Bruingtons filed an emergency application asking this Court to issue a capias or writ of attachment requiring the court reporter to show cause why she had not filed the record. Chesmar Homes moved to strike the Bruington's application as untimely filed and further moved to strike any references the Bruingtons made in their brief to the evidence presented at the hearing. In the meantime, the court reporter filed the transcript of the hearing as well as the exhibits admitted at the hearing. Because our review of the reporter's record and exhibits have led us to conclude that the trial court properly dismissed the Bruingtons' claims, we deny as moot Chesmar Homes' emergency application and its motion to strike.

Chesmar Homes' allegedly negligent conduct to support a finding that their negligence claims were ripe for review.

### B. Analysis

As set forth above, the Bruingtons asserted in their pleadings that they had been damaged by Chesmar Homes' alleged negligence in failing to take adequate steps to (1) prevent development site runoff from encroaching on their property and (2) compress and water down the dirt on the development site to prevent dust from blowing onto their property. The Bruingtons alleged that as a result, they suffered damages by having to "continually expend money to remove the continually deposited silica particles from their real and personal properties," and their property "suffered a diminution in value in excess of the jurisdictional limits" due to the blowing dust in the area and potential for flooding. They contend they raised a factual "dispute" as to those alleged damages that must be resolved by a jury. We disagree.

First, we note that although the Bruingtons alleged they had to "continually expend money" to remove the dust particles from their property, the Bruingtons did not come forward with any jurisdictional evidence of such. At the hearing, the Bruingtons presented evidence of only one incident occurring on August 10, 2022—and arguably one other incident occurring on an undisclosed date—during which dust had settled on their property. But Bruington acknowledged that at most, he and his wife had to wash their vehicles to remove the dust. However, he did not testify to the cost of their car-washing expenses or indicate how many other times (if any) they had incurred such expenses. We therefore do not find his testimony sufficient to raise a material

question of fact regarding whether the Bruingtons had suffered damages so as to make their negligence claim ripe for review.[8]

Similarly, we conclude that the Bruingtons failed to proffer sufficient jurisdictional evidence to support their claim that their property suffered a "diminution in value" due to Chesmar Homes' activities. At the hearing, they presented no evidence that their property had in fact suffered any such diminution value—whether due to Chesmar Homes' activities or otherwise. Rather than presenting any such evidence, the Bruingtons relied on an argument, which they renew on appeal, that their property necessarily suffered a diminution in value due to their belief that if they decided to sell their property, they would be required to disclose the possibility of flooding and/or damage from the blowing dust to potential buyers pursuant to § 5.008 of the Texas Property Code. The Bruingtons presented no evidence that they were selling their home or that disclosing their fears to a potential buyer would result in a lower purchase price.[9]

Accordingly, the Bruingtons' contention that their property suffered a diminution in value is based solely on speculation and events that may or may not ever occur. We therefore conclude the Bruingtons did not to come forward with sufficient jurisdictional evidence to support a finding that their negligence claims were ripe for review. *See Gibson*, 22 S.W.3d 849, 852 (Tex. 2000) (recognizing that a "ripeness analysis focuses on whether the case involves 'uncertain or contingent future events that may not occur as anticipated or may not occur at all'").

---

[8] To invoke the jurisdiction of a district court, the amount in controversy must be more than $500, exclusive of interest. TEX. GOV'T CODE ANN. § 24.007(b). The Bruingtons presented no evidence to suggest that their car wash expenses were in excess of $500 so as to satisfy the minimum jurisdictional requirements of the court in which they filed their claims.

[9] Section 5.008 provides that a seller must disclose certain conditions and defects on his property to a potential buyer. TEX. PROP. CODE ANN. § 5.008. Given the premature nature of their argument, however, we do not address whether the Code would require them to disclose their fears to a potential buyer if they were to sell their property in the future.

## No Jurisdictional Facts to Support the Nuisance Claims

We next consider whether the Bruingtons came forward with sufficient jurisdictional evidence to support a finding that their nuisance claims were ripe. We conclude they did not.

### A. Applicable law

The Texas Supreme Court discussed the requirements for establishing a private nuisance claim in *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 594–604 (Tex. 2016).[10] In *Crosstex*, the court explained that the "law of nuisance recognizes that certain injuries to a person's right to the 'use and enjoyment of property' can . . . constitute a form of legal injury for which a legal remedy will be granted." *Id.* at 594 (citing *City of Tyler v. Likes*, 962 S.W.2d 489, 504 (Tex. 1997)). It further recognized that a nuisance could "involve interference with numerous different interests through both physical substances and intangible conditions, such as 'water, stones, rubbish, filth, smoke, dust, odors, gases, noises, vibrations, and the like.'" *Id.* at 592 (citing *Gulf, Colo. & Santa Fe Ry. Co. v. Oakes*, 58 S.W. 999, 1001 (1900)). But the court also emphasized that "an interference qualifies as a nuisance—and thus as a legal injury—only if the interference is substantial and causes discomfort or annoyance that is unreasonable." *Id.* at 595. (internal quotations omitted). By requiring substantial interference with the plaintiffs' use and enjoyment of their property, the court set a "minimum threshold that confirms that the law 'does not concern itself with trifles, or seek to remedy all of the petty annoyances and disturbances of every day life in a civilized community even from conduct committed with knowledge that annoyance and

---

[10] We note that there are two types of nuisance claims, public and private, which are based on "two distinct conditions with different requirements and limitations." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 591, n. 3 (Tex. 2016). Although the Bruingtons alleged a claim for both types of nuisance in their pleadings, they only address the requirements for establishing a claim of private nuisance in their appellate briefing. We therefore only address that claim.

17

inconvenience will result.'" *Id.* (citing Prosser and Keeton § 88, at 626). "Whether an interference is substantial or merely a 'trifle' or 'petty annoyance' necessarily depends on the particular facts at issue, including, for example, the nature and extent of the interference and how long the interference lasts or how often it recurs." *Id.* at 595-96. Whether a "private nuisance" can be established will vary depending on the circumstances; the condition caused by the defendant "may interfere with a wide variety of the plaintiffs' interests in the use and enjoyment of their property, [including] physical damage to the plaintiffs' property, economic harm to the property's market value, harm to the plaintiffs' health, or psychological harm to the plaintiffs' 'peace of mind' in the use and enjoyment of their property." *Id.* at 596.

The court cautioned, however, that even a substantial interference does not constitute a nuisance unless it is "unreasonable." *Id*. at 596. The court emphasized three points a court should consider in making that determination. *Id.* First is the "unreasonableness of the interference's effect on the plaintiff's comfort or contentment, not on the unreasonableness of the defendant's conduct or land use." *Id.* Second is whether the interference was unreasonable "based on an objective standard of persons of ordinary sensibilities, not on the subjective response of any particular plaintiff." *Id.* In other words, the interference must be such that it "would disturb and annoy persons of ordinary sensibilities, and of ordinary tastes and habits." *Id*. at 599 (internal quotation marks omitted); *see also Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 269 (Tex. 2004) (a "nuisance" is "a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities."). Thus, "[i]t is not enough that plaintiff himself is offended or annoyed if he is peculiarly sensitive." *Crosstex*, 505 S.W.3d at 600. Third, "as is typical with legal inquiries into reasonableness, the determination requires balancing a wide variety of factors, depending on the specific facts." *Id.* at 596.

**B. No evidence of a substantial or unreasonable interference**

Bruington testified he was being deprived of the use and enjoyment of his property in that he could not be safely outside because of his fear of silica in the dust in the air from the development site. However, as explained above, the Bruingtons provided no evidence that exposure to the dust posed any health risks such that it was unsafe to be outside on their property. Although Bruington testified he and his wife had received a report that there was silica in a dust sample they submitted to a lab for testing, they presented no evidence that the level of silica in the dust was unsafe or that it was causing them any health problems or was likely to do so in the future. In fact, Bruington acknowledged that he had no expertise to determine what level of exposure to silica would be safe, and he and his wife had not seen a physician to determine if they had been affected by any such exposure.

At best, the Bruingtons' claim that they were being deprived of the use and enjoyment of their property is based solely on their subjective and speculative opinion that they could not use their property safely. But such evidence falls short of raising a material question of fact on the issue of whether—based on an objective standard—the Bruingtons were being unreasonably deprived of the use and enjoyment of their property. *See Kane v. Cameron Intern. Corp.*, 331 S.W.3d 145, 148 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (finding that the trial court properly granted summary judgment dismissing plaintiff's private nuisance claim where it was based on speculation that plaintiff had been exposed to dangerous chemicals on his land and/or in the groundwater on his property) (citing *Coastal Transport Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) ("[o]pinion testimony that is conclusory or speculative is not relevant evidence because it does not tend to make the existence of a material fact 'more probable or less probable'")).

19

Moreover, as explained below, we conclude the Bruingtons also failed to come forward with sufficient jurisdictional evidence to establish that they suffered any damages from the alleged nuisance or that injunctive relief was warranted to abate the alleged nuisance, as would be necessary to support a finding that their nuisance claims were ripe for review. *See generally Crosstex*, 505 S.W.3d at 610 (recognizing that in addition to self-abatement, a "claimant who prevails on a private-nuisance claim" potentially has two remedies available to him, including damages and injunctive relief to abate the nuisance) (citing *Storey v. Cent. Hide & Rendering Co.*, 226 S.W.2d 615, 617 (1950)).

**(1) The Bruingtons' claim for nuisance damages is not ripe for review**

In general, the type of damages available in a private nuisance case depends on whether the nuisance is permanent or temporary. If permanent, a private-nuisance claimant may seek damages for a diminution of value of his property, i.e., the "lost market value" of his property resulting from the nuisance. *See Crosstex*, 505 S.W.3d at 610 (recognizing that if a nuisance is permanent, the owner "may recover lost market value—a figure that reflects all losses from the injury, including lost rents expected in the future") (quoting *Schneider*, 147 S.W.3d at 276); *see also Gilbert Wheeler, Inc. v. Enbridge Pipelines (E.Tex.), L.P.*, 449 S.W.3d 474, 480 (Tex. 2014). The Bruingtons' claim for nuisance damages again centers on their allegation that Chesmar Homes' activities caused a diminution in value of their property, which would require a finding that any nuisance caused by those activities was permanent in nature. In addition to not presenting any evidence that their property diminished in value, the Bruingtons did not present any evidence that Chesmar Homes' activities could be considered a "permanent" nuisance so as to be entitled to damages of this nature. A permanent nuisance is "one that involves 'an activity of such a character and existing under such circumstances that it will be presumed to continue indefinitely.'"

20

*Schneider*, 147 S.W.3d at 272 (citing *Bayouth v. Lion Oil Co.*, 671 S.W.2d 867, 868 (Tex. 1984); *Atlas Chem. Indus., Inc. v. Anderson*, 524 S.W.2d 681, 684 (Tex. 1975)). And a nuisance will only be considered permanent if it is "constant and continuous" and if "injury constantly and regularly recurs." *Id.* In contrast, a nuisance is considered "temporary if it is of limited duration [or] if it is uncertain if any future injury will occur, or if future injury 'is liable to occur only at long intervals.'" *Id.* at 272.

At most, the Bruingtons established a temporary nuisance based on the video of a single incident in which dust settled on their property, their acknowledgement that they had not seen any blowing dust in the area in the weeks leading up to the hearing, and their admission that they were unaware of Chesmar Homes' upcoming construction schedule and therefore could not say when, or if, the dust issues might reoccur. If a nuisance is temporary, "the landowner may recover only lost use and enjoyment . . . that has already accrued" up to the trial of the action, which may be calculated in terms of "loss of rental value," "use value," or "possibly the cost of restoring the land." *Crosstex*, 505 S.W. ed at 610; *see also Schneider*, 147 S.W.3d at 277, n. 51 (chronicling 1889 to 1951 cases recognizing this rule). But, as explained above, the Bruingtons presented no evidence of damages from the blowing dust or the runoff from the development site; they only presented Bruington's testimony about the fear that they *might* suffer such a loss in the future.

Accordingly, we conclude the Bruingtons' claim for nuisance damages is not ripe for review. *See 1717 Bissonnet, LLC v. Lougheed*, 500 S.W.3d 488, 496–97(Tex. App.—Houston [14th Dist.] 2016, no pet.) (recognizing that a plaintiff may only collect damages that resulted from an *existing* nuisance and may not collect damages "caused by a prospective nuisance").

**(2)   The Bruingtons' claim for injunctive relief is not ripe for review**

For similar reasons, we conclude the Bruingtons' claim for injunctive relief is also not ripe for review. A court only has the power to enjoin the continuance of an "existing nuisance," as opposed to a threatened or prospective nuisance except under certain cirmcumstances. *See Freedman v. Briarcroft Prop. Owners, Inc.*, 776 S.W.2d 212, 216 (Tex. App. —Houston [14th Dist.] 1989, writ denied); *see also Holubec v. Brandenberger*, 214 S.W.3d 650, 657 (Tex. App.—Austin 2006, no pet.) (recognizing that "an injunction will be granted only to restrain actually existing nuisances, and not to restrain an intended act on the ground that it may become a nuisance"); *Goose Creek Ice Co. v. Wood*, 223 S.W. 324, 327–28 (Tex. App.—Galveston 1920, no writ) (recognizing same). And again, the Bruingtons only presented evidence of one incident in which dust settled on their property in the past, and they have not presented any authority to suggest this could be considered a current or existing nuisance for which injunctive relief would be warranted.

When there is no current or existing nuisance, a court of equity is still "empowered to interfere by injunction to prevent a threatened injury where an act or structure will be a nuisance per se, or will be a nuisance for which there is no adequate remedy at law, or where a nuisance is imminent." *Freedman*, 776 S.W.2d at 216 (citing 66 C.J.S. *Nuisances* § 113 p. 8818 p. 742 (1950); *O'Daniel v. Libal*, 196 S.W.2d 211, 213 (Tex. Civ. App.—Waco 1946, no writ)). The Bruingtons, however, did not come forward with sufficient jurisdictional evidence to support the injunctive relief request in any of these regards.

First, the record contains no evidence from which we could conclude that Chesmar Homes' activities in constructing a new subdivision could be considered a nuisance per se. A nuisance per se is "an act, occupation, or structure that is a nuisance at all times, under any circumstances, and

in any location." *City of Dallas v. Jennings*, 142 S.W.3d 310, 316, n. 3 (Tex. 2004) (citing *Maranatha Temple, Inc. v. Enter. Prods. Co.*, 893 S.W.2d 92, 100 (Tex. App.–Houston [1st Dist.] 1994, writ denied)); *see also Aguilar v. Morales*, 162 S.W.3d 825, 836 (Tex. App.—El Paso 2005, pet. denied) (citing *Freedman*, 776 S.W.2d at 216). The Bruingtons do not suggest that the development site is a nuisance per se, nor do we believe that it could be characterized as such, as we fail to see how the construction of a new subdivision, which is a lawful endeavor, could be considered a "nuisance at all times." *See generally Storey*, 226 S.W.2d at 617 (finding that the operation of a rendering plant was a "lawful business" and did not constitute a nuisance per se).

Second, the Bruingtons did not come forward with any jurisdictional evidence to suggest that the development site poses a threat of irreparable injury for which there is no adequate remedy at law. In general, a party may suffer irreparable injury and will have no adequate legal remedy if a nuisance is "recurring" and if the evidence demonstrates "that the author of the nuisance will not cease the nuisance without a court order." *See Hall v. Seal*, No. 04-09-00675-CV, 2011 WL 61631, at *3 (Tex. App.—San Antonio Jan. 5, 2011, pet. denied) (mem. op.) (citing *Holubec*, 214 S.W.3d at 656). However, as set forth above, the Bruingtons only provided evidence of, at most, two times dust settled on their property—with no resulting damage—and no evidence of any flooding on their property. We therefore conclude that the evidence failed to raise a fact issue as to the existence of a recurring nuisance. Moreover, the Bruingtons themselves appear to recognize that they have an adequate remedy at law—in terms of being compensated for any property damages they might suffer from Chesmar Homes' activities in the future—given that they requested as much in the pleadings.

Third and finally, the Bruingtons did not to come forward with any jurisdictional evidence to support a finding that a "nuisance is imminent." It is well-established that "probable, imminent,

and irreparable injury requires proof of an actual threatened injury, as opposed to a speculative or purely conjectural one." *Tex. Dep't of Pub. Safety v. Salazar*, 304 S.W.3d 896, 908 (Tex. App.—Austin 2009, no pet.). Therefore, injunctive relief to restrain or abate a prospective nuisance is not properly granted when "the party seeking the injunction has mere fear or apprehension of the possibility of injury." *Pauli v. Hayes*, No. 04-17-00026-CV, 2018 WL 3440767, at *11 (Tex. App.—San Antonio July 18, 2018, no pet.) (mem. op.) (citing V*aughn v. Drennon*, 202 S.W.3d 308, 313 (Tex. App.—Tyler 2006, no pet.); *Holubec*, 214 S.W.3d at 657); *see also Frey v. DeCordova Bend Estates Owners Ass'n*, 647 S.W.2d 246, 248 (Tex. 1983) (recognizing that "fear or apprehension of the possibility of injury alone is not a basis for injunctive relief"); *Fuentes v. Union de Pasteurizadores de Juarez Sociedad Anonima de Capital Variable*, 527 S.W.3d 492, 501 (Tex. App.—El Paso 2017, no pet.) (a temporary injunction is not proper when the claimed injury is "merely speculative [and] based on [f]ear and apprehension of injury").

Here, Bruington, who served as the Bruingtons' only witness and who acknowledged at the hearing that he had no expertise in the area, was only able to testify to his subjective belief that Chesmar Homes was not taking proper precautions to avoid the possibility that the Bruingtons' property could be damaged by potential flooding or the recurrence of blowing dust in the area. And they presented no objective evidence of this possibility. In other words, the Bruingtons' evidence only established their fear or apprehension of future and speculative damage due to Chesmar Homes' activities, which is insufficient to support their claim for injunctive relief. Accordingly, we agree with the trial court that the Bruingtons failed to establish their claim for injunctive relief was ripe for review.

## CONCLUSION

Having found none of the Bruingtons' claims ripe for review, we overrule the Bruingtons' sole issue on appeal. We affirm the trial court's judgment dismissing the Bruingtons' lawsuit without prejudice for lack of subject matter jurisdiction and deny all pending motions as moot.

LISA J. SOTO, Justice

October 20, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.